In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――

No. 05-4073

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TIMOTHY D. WILBURN, SR.,

*Defendant-Appellant.*

―――――――

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 04-CR-80—**Rudolph T. Randa**, *Chief Judge.*

―――――――

ARGUED OCTOBER 31, 2006—DECIDED JANUARY 11, 2007

―――――――

Before POSNER, WOOD, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* After a 2-day jury trial, Timothy Wilburn was found guilty of being a felon in possession of two firearms: a 9mm Cobray Mac-11 semi-automatic and a 9mm Glock, with an attached laser sight. He was sentenced, after a finding that he had three prior violent felony convictions, to the statutory minimum term of 15 years under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e).[1] On this appeal, Wilburn challenges both his conviction and sentence.

―――――――

[1] Wilburn's sentence was substantially below his 210-262 months advisory guideline range.

The issue regarding Wilburn's conviction primarily concerns matters recently addressed by the Supreme Court in *Georgia v. Randolph*, ___ U.S. ___, 126 S. Ct. 1515 (2006). The sentencing issue concerns whether one of his earlier convictions, a juvenile adjudication for being a party to armed robbery, was properly included as one of the three prior convictions that brought him under the ACCA. We begin with Wilburn's challenge to his conviction, which centers on a claim that his motion to suppress evidence—the two guns, of course—should have been granted.

*Randolph* holds that police violate the Fourth Amendment when they conduct a search, authorized by a person with apparent authority to consent, over the objection of a physically present potential defendant who shares the premises and declines to offer his consent. But *Randolph* is a rather narrow holding, and no matter how hard Wilburn wiggles—like the stepsisters trying to squeeze into Cinderella's glass slipper—he can't fit within its embrace.

In March of 2004, Milwaukee Police Officer Bodo Gajevic received an anonymous tip. With the tip and other intelligence he gathered, Gajevic learned that Wilburn was living with a woman named Sophia Taylor at 5611 North 40th Street (Apartment 7) in Milwaukee. More importantly, Gajevic learned that Wilburn was a felon in possession of handguns and that he had a revoked drivers license. Armed with this information, Gajevic and other officers staked out the Taylor/Wilburn apartment. They soon got lucky: Wilburn left through the front door, walked to the rear of the apartment complex, entered a car, and drove off. After Wilburn drove a short way, just around the block, and pulled up to the front of the apartment (he was hoping to pick up Taylor so they could go and do their laundry), he was stopped by the police and arrested for driving with a revoked drivers license. A search of

Wilburn's person and the car he was driving came up dry for guns. Wilburn was then handcuffed and placed in the back seat of a squad car, some 40 feet or so from the entrance to the apartment building.

A driving-with-a-revoked-license charge was not what Gajevic and the other officers had in mind when they staked out Wilburn's apartment. They had bigger fish to fry—the firearms they were led to believe that he possessed. So, with Wilburn in the squad car with one of the officers, Gajevic and others walked up to the apartment and encountered Taylor (with several children), who was apparently on her way out.

Gajevic informed Taylor of the nature of the investigation and told her that, "for right now," Wilburn was under arrest for driving after revocation. During this encounter, Taylor related that she had been living in the apartment for the past 6 years and that Wilburn, whom she had been "dating," had been staying with her for the past 3 months. Gajevic asked for and received consent from Taylor to search the residence. In response to some hesitation on Taylor's part, Gajevic told her that he was searching only for guns and that he would concentrate his search on places where Wilburn had his belongings. The officers then entered the apartment with Taylor and proceeded to search the bedroom and a closet shared by Taylor and Wilburn. In their search of the closet, the officers found a black, unmarked duffel bag that was unlocked but zippered shut. In it they found the Cobray semi-automatic. No other weapons were found.

While the search was taking place, Detective Michael Simonis waited outside in the squad car with Wilburn. Simonis did not question Wilburn about guns or mention anything at all about the gun investigation. Instead, he focused on obtaining routine background information from Wilburn.

After hearing that the Cobray was discovered, Wilburn expressed concern because, among other things, he was on parole. He said he wanted to cooperate. Later, at the police station, he told officers where the second gun, the Glock, could be found.

In trying to wedge himself under *Randolph*, Wilburn says the police, knowing he would object to the search, deliberately kept him in the squad car away from Taylor while she was giving her consent. But even if the police were clairvoyant—*Randolph* was decided 2 years and 15 days *after* the search of the Taylor/Wilburn apartment— the police here were not doing an end run around its holding. Wilburn was validly arrested (even he admits this inconvenient truth) and he was lawfully kept in a place—the back seat of a squad car—where people under arrest are usually held. Given these facts, the police were not obligated to bring Wilburn to Taylor so he could be a party to the discussion regarding consent.

The majority opinion in *Randolph* distinguished *United States v. Matlock*, 415 U.S. 164 (1974), which recognized the permissibility of a search made with the consent of one co-occupant in the other's absence. The "absent" defendant in *Matlock* was arrested in the front yard of a house and detained in a squad car nearby while officers, at the doorway of the house, obtained consent to search from a woman with whom he lived.

Addressing the significance of *Matlock*—and also *Illinois v. Rodriguez*, 497 U.S. 177 (1990), a case involving a defendant who was asleep when police obtained consent from a co-tenant—the *Randolph* Court observed:

> Although the *Matlock* defendant was not present with the opportunity to object, he was in a squad car not far away; the *Rodriguez* defendant was actually asleep in the apartment, and the police might have roused him with a knock on the door before they entered with only

the consent of an apparent co-tenant. If those cases are not to be undercut by today's holding, we have to admit that we are drawing a fine line; *if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.*

This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it.

*Randolph*, 126 S. Ct. At 1527-1528 (emphasis added). The Court went on to defend this admittedly "formalistic" rule, noting that requiring police to search out potential objectors would limit their "capacity . . . to respond to ostensibly legitimate opportunities in the field" and turn every third-party consent case into "a test about the adequacy of the police's efforts to consult with a potential objector."

The facts in this case establish that Wilburn was not "physically present" when Taylor consented, and the police did not deliberately remove him from the area to avoid hearing him invoke an objection to the search. For these reasons, *Randolph* can offer Wilburn no comfort.

Wilburn raises one more search issue, but it is frivolous under these facts: Taylor had actual (and at the very least apparent) authority to consent to the search, and her consent included looking into the unlocked and unmarked duffel bag found in the closet of the shared bedroom.

Wilburn attacks his sentence on two grounds, the first apparently to preserve an argument for future consideration in the event the Supreme Court changes the law. As to this argument, the "prior conviction" exception to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), despite some lingering doubts most recently expressed in *Shepard v. United States*, ___ U.S. ___, 125 S. Ct. 1254 (2005), remains the law, and Wilburn's claim that the jury should have considered and resolved issues about his criminal record must be rejected. As the Court explained in *Apprendi*, there is a "vast difference" between "accepting the validity of a prior judgment of conviction entered in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt," and allowing a judge rather than a jury to find in the first instance facts that "'relate to the commission of the offense' itself." 530 U.S. at 496 (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 244 (1998)). Indeed, because a prior conviction "must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees," it is "unlike virtually any other consideration used to enlarge the possible penalty for an offense." *Jones v. United States*, 526 U.S. 227, 249 (1999).

In his second sentencing challenge, Wilburn, although recognizing the obstacles against him, argues that his juvenile adjudication is not countable as one of the predicate "convictions" for triggering the ACCA. Congress, however, has specifically authorized the inclusion of juvenile adjudications for ACCA purposes, 18 U.S.C. § 924(e)(2)(C), and it is not our role to rewrite the law. It is, of course, our role to decide whether *Apprendi* and *Almendarez-Torres* call into question the constitutionality of the ACCA rule. *Compare United States v. Burge*, 407 F.3d 1183, 1190 (11th Cir. 2005) (holding that juvenile convictions, including those where there was no right to

a jury, may be considered for ACCA purposes); *United States v. Jones*, 332 F.3d 688, 694-96 (3d Cir. 2003) (same); *United States v. Smalley*, 294 F.3d 1030, 1031-32 (8th Cir. 2002) (same); *with United States v. Tighe*, 266 F.3d 1187, 1192-95 (9th Cir. 2001) (holding that the "prior conviction" exception does not include nonjury juvenile adjudications). We have not yet taken a position on this debate, nor do we need to do so here. At the time, Wisconsin law afforded Wilburn a right to a jury trial in the juvenile proceeding, and thus his conviction could be used even under the Ninth Circuit's rule. Given that Wilburn does not argue that his juvenile offense—party to the crime of armed robbery—was "non-violent," we must reject his claim that "public policy" makes it off-limits to a sentencing judge counting prior criminal acts under the ACCA.

For these reasons, the judgment of the district court is AFFIRMED.

A true Copy:

       Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
