In the

# United States Court of Appeals

### For the Seventh Circuit

————————

No. 07-3613

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CHRISTOPHER DARON HICKS,

*Defendant-Appellant.*

————————

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 07 CR 56—**J. P. Stadtmueller**, *Judge.*

————————

ARGUED APRIL 8, 2008—DECIDED AUGUST 20, 2008

————————

Before KANNE, WILLIAMS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* On March 6, 2007, a grand jury in the Eastern District of Wisconsin returned a two-count indictment against the defendant, Christopher Hicks, alleging (1) possession of a firearm by a felon, violating 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and (2) possession of a firearm not registered to him in the National Firearms Registration and Transfer Record, violating 26 U.S.C. §§ 5861(d) and 5871. The firearms had been seized in a

search conducted by Milwaukee police officers. On March 27, 2007, Hicks filed a motion to suppress physical evidence. The magistrate conducted an evidentiary hearing on April 12, 2007, and recommended on May 1, 2007, that the motion be denied. Hicks filed his objections to the recommendation on May 11. The district court adopted the magistrate's recommendation and denied the motion to suppress in an order issued June 1, 2007. Hicks filed a motion for reconsideration on June 15, 2007. Also on June 15, the parties filed a plea agreement. On June 18, the judge denied the motion to reconsider and accepted Hicks's guilty plea. The plea reserved the right to appeal the denial of the motion to suppress. The sentencing hearing was held on October 18, 2007, where the court sentenced Hicks to 37 months' imprisonment to be followed by three years' supervised release and a $100 special assessment. Hicks is now appealing the denial of his suppression motion.

## I.  Factual Background

We outline the basic facts here and delve into the specifics below, as necessary, in our analysis. Detective Wayne Armon of the Milwaukee Police Department was conducting an investigation of a shooting that occurred on October 11, 2006. On December 24, 2006, Armon asked Detective Donald Brown to go to Hicks's flat at 944B North 37th Street, Milwaukee, Wisconsin and instructed Brown to get consent to search. According to Brown, Armon told him there was enough to get a warrant, but Brown himself did not have knowledge of any facts that would

establish probable cause. In addition to a suspected connection to the October 11 incident, there were two municipal warrants for Hicks's arrest. After establishing that Hicks's residence was the upper rear flat of the duplex, Brown and other officers went up and knocked. Hicks answered and was immediately handcuffed and placed under arrest. The officers conducted a protective sweep and discovered Hicks's girlfriend, Samella Smith, and four children, all of whom had been asleep. Smith, upon request, got clothes for Hicks who was in the kitchen, and then Smith and the children were told to wait in the living/dining area. During all of this, Hicks was upset and vocal, asking why the police were there and so on. After getting dressed, Hicks was removed from the residence and taken out to the squad car. At some point relatively soon thereafter, he was taken downtown to the police station.

After Hicks's removal, Detective Brown sought consent to search from Smith. Smith resisted, telling Brown that the police should get a warrant. Brown continued talking with her and at some point in the conversation, Brown told her that he could obtain a search warrant, but that it could take some time. He told her it was Christmas Eve and that with her cooperation he would not destroy her house in the search. He also told her he believed there were guns in the residence with children in the home. Smith told Brown to "go ahead." Nevertheless, she refused to sign a consent statement in his memo book. In the search, officers found, in Smith and Hicks's bedroom, a loaded Smith and Wesson, .40 caliber, semi-automatic handgun, additional ammunition, and a loaded sawed-off Mossberg .12 gauge shotgun, with a pistol grip.

## II.  Analysis & Discussion

Hicks is presently appealing the denial of his motion to suppress because he believes that the warrantless search was unlawful. He raises three particular issues: (1) whether the district court erred in finding that Hicks did not object to the search and that the removal of Hicks to the squad car was not intended to prevent him from objecting to the search; (2) whether the district court erred in concluding that Smith consented to the search; and (3) whether the district court erred in determining that the police had a genuine belief that a warrant could be obtained. We will address each in turn, although they do overlap considerably. Our review of the legal questions is de novo and the factual findings for clear error. *United States v. DiModica*, 468 F.3d 495, 498 (7th Cir. 2006).

Hicks argues that his comments (along the lines of "What are you doing here?") made to the officers while they were all in his flat prior to his removal constitute an objection to the search. He explains that as an overnight guest his right to object is clearly established, *see Minnesota v. Olson*, 495 U.S. 91, 98 (1990), and that as a physically present co-occupant his stated refusal to permit entry renders the search invalid as to him, nullifying any consent from Smith, *see Georgia v. Randolph*, 547 U.S. 103, 109 (2006). In support, he focuses on the following testimony from Detective Brown:

> Q: He objected to your being present?
>
> A: Probably did, yes, he did.

The district court, however, concluded otherwise, finding that "there was no evidence that he objected to a search

taking place; to be sure, he objected to his arrest and removal, but he did not specifically object to a search of the premises." Hicks disagrees, arguing that it's more likely his statements were directed to the police and their protective sweep, which is a sort of search, and, regardless, an objection to police presence should be equated to an objection to a search. He cites a district court case, *United States v. Henderson*, No. 04 CR 697, 2006 WL 3469538 (N.D. Ill., Nov. 29, 2006), *rev'd*, *United States v. Henderson*, No. 07-1014, 2008 WL 3009968 (7th Cir. Aug. 6, 2008), for support.

We do not agree with Hicks and find that the district court did not clearly err. At the time of his protestations, Hicks was being arrested—no officers had even mentioned a search to him, and he was not asked to give his consent at any point. It is likely that many individuals being arrested are going to object, and many of them might even be vocal and upset about it. (Especially when getting arrested in your home, immediately upon waking, while scantily clad, in front of your girlfriend and children, on Christmas Eve.) It was reasonable for the district court to understand his remarks as responsive to the police who were there arresting him. As a factual finding, this is only subject to clear error review; it was not clearly erroneous for the district court to find that Hicks's objections were only to his arrest and removal rather than to the search.

In contrast, the district court in *Henderson* found that the statement "Get the f*** out of my house" "included a direction that they . . . refrain from searching the residence." *Henderson*, 2006 WL 3469538, at *2; *see also United*

*States v. Henderson*, 2008 WL 3009968, at *2 (mentioning that "the district court reasonably construed [the statement] as an objection to a search"). The district court in the present case found differently than the court in *Henderson* on the particular facts before it, and while it would not have been precluded as a matter of law from concluding otherwise, the district court did not clearly err in finding as it did.

Alternatively, we also note that even if we had found as Hicks requests—that his statements amounted to an express objection to the search—he would still have to overcome the requirement that one occupant objecting to the search has to be "physically present" at the relevant time in order to nullify the other co-occupant's permission. *See Henderson*, 2008 WL 3009968, at *4-9. See *Randolph*, 547 U.S. at 121-22, where the Court drew a "fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in threshold colloquy, loses out." Since Hicks's alleged objection took place well before Smith, or anyone, was approached about consenting to a search, he would not prevail as he was not "physically present" for the relevant colloquy. *Henderson*, 2008 WL 3009968, at *7 ("[W]e see the contemporaneous presence of the objecting and consenting cotenants as indispensable to the decision in *Randolph*."); *see also Randolph*, 547 U.S. at 121-23; *DiModica*, 468 F.3d at 500; *United States v. Hudspeth*, 518 F.3d 954, 960-61 (8th Cir. 2008) (en banc). *But see United States v. Murphy*, 516 F.3d 1117, 1124 (9th Cir. 2008) ("We hold that when a

co-tenant objects to a search and another party with common authority subsequently gives consent to that search in the absence of the first co-tenant the search is invalid as to the objecting co-tenant.").

Intimately related, and crucial to understanding our conclusions just discussed, is the question of whether Hicks was removed from the scene in order to prevent him from objecting. The Court in *Randolph* elaborated on the point quoted *supra* with the following: "So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity" of the rule. *Randolph*, 547 U.S. at 120; *see also United States v. Wilburn*, 473 F.3d 742, 745 (7th Cir. 2007). Therefore, if officers remove a potential objector simply in order to avoid his objection, the Court suggests that the consent obtained as a result is invalid. In this case, the district court was correct in determining that Hicks was not removed "for the sake of avoiding a possible objection." The officers removed Hicks in order to execute an arrest. *See Henderson*, 2008 WL 3009968, at *8 ("Once he was validly arrested . . . and taken to jail, however, his objection lost its force, and [his wife] was free to authorize a search of the home."); *DiModica*, 468 F.3d at 500 ("The officers did not remove DiModica to avoid his objection; they legally arrested DiModica based on probable cause that he had committed domestic abuse."); *cf. Wilburn*, 473 F.3d at 745 ("Wilburn was validly arrested . . . and he was lawfully kept in place—the back seat of a squad car—where people under arrest are usually held."). Hicks was not removed so that he would

not object; he was removed because he was being arrested. The district court's fact finding on this point is not erroneous, and its legal conclusions are correct.

The Court in *Randolph* expressed a preference for clear lines and a distaste for any unnecessary gray area, thus we take care to read the law closely and consider the practical consequences for police. *See Randolph*, 547 U.S. at 121-23; *see also*, *Wilburn*, 473 F.3d at 745. It is most reasonable to view this scenario as one in which the officers simply put Hicks into the car and took him away in order to execute an arrest—that process is simply what happens when someone gets arrested. If we found otherwise on these facts, then police might feel they have to start asking arrestees to clarify whether they object to a search every single time the police escort an arrestee out to the car, or every angry arrestee's ranting words would necessarily be construed as an objection to a search. Such an outcome from these facts would be unwise, impracticable, and contrary to established law. *Cf. Randolph*, 547 U.S. 121-23 ("[W]e think it would needlessly limit the capacity of the police to respond to ostensibly legitimate opportunities in the field if we were to hold that reasonableness required the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received."). The rule in *Randolph* is clear, and it simply provides Hicks no relief in these circumstances.

To address the second issue Hicks presents for our review, we narrow in on Samella Smith's consent. You'll recall that following some initial resistance, after several

minutes talking with Detective Brown, an upset Smith gave an oral "go ahead" for the search. The government bears the burden of proving that any consent was freely and voluntarily given. *United States v. Johnson*, 495 F.3d 536, 541 (7th Cir. 2007). This is based on the totality of the circumstances, with established relevant factors including the age, education, and intelligence of the consenting individual; whether the person was advised of her constitutional rights; how long the person was detained before giving consent; whether consent was immediate or prompted by repeated requests; whether there was any physical coercion; and whether the person giving consent was in custody at the time. *Id.* at 542.

Hicks focuses on whether the consent was immediate or prompted by repeated requests. He argues that as soon as Smith told the officers to get a warrant, the police should have left and asks us to infer that the police were "intent" on "overriding" her refusals. We simply do not find his arguments on this point convincing. The testimony is that Brown continued talking with Smith somewhere between five and twenty minutes after her initial refusal. Smith was upset at the time, and some portion of the conversation was spent discussing Hicks. We find no error in the district court's determination that talking to Brown "was not so lengthy as to nullify her consent, nor does her initial refusal to consent render the search invalid." This is not a case of the police coercing Smith or too aggressively seeking her consent.

Hicks's argument makes too little of the nature of the analysis—a consideration of the "totality of the circum-

stances." His arguments focus on a single factor. Yet Smith was not detained or under arrest; there was never any physical coercion. She is a 22-year-old adult, with four children, who is employed as an officer manager. Her words to "go ahead" were sufficient to indicate her consent. Therefore, aside from the legal issue we take up next, we do not find error with the district court's determination that Smith's consent was freely given.

This leads us to Hicks's final argument: that because the government did not show that the police threat to obtain a warrant was based in fact, the district court clearly erred when it found, without inquiry, that the police "had a legitimate belief" that they could obtain a search warrant. We have held that "[b]aseless threats to obtain a search warrant may render consent to search involuntary" and "[w]hen the expressed intention to obtain a warrant is genuine, . . . and not merely a pretext to induce submission, it does not vitiate consent to search." *United States v. White*, 979 F.2d 539, 542 (7th Cir. 1992); *see also United States v. Duran*, 957 F.2d 499, 502 (7th Cir. 1992). The district court explained in this case that "the court does not conclude that there actually was probable cause to obtain a warrant; the court only determines that Brown appeared to be acting upon a legitimate belief that a search warrant could be obtained." The court found Brown's expressed intention to get a warrant genuine and not a pretext to induce submission, and Smith's consent, accordingly, not vitiated.

We disagree. The district court did not err in its fact finding per se, but rather took an incorrect view of the law. The district court interpreted our case law to mean

that if Brown's statement reflected a legitimate belief, then the stated intention to get a warrant did not create a problem with the consent. We do not question the district court's determination that Brown personally believed what he said. But we find that it was error to evaluate whether the stated intention to get a warrant was genuine or pretextual without considering whether the police actually had the underlying probable cause for the search.

Consider: If the police did *not* have a reasonable basis to believe there was probable cause then it follows that any statement, or "threat," that a search warrant could be obtained would necessarily be "baseless" and could *only* be "merely a pretext to induce submission." In that case, the consent may be involuntary. *See White*, 979 F.2d at 542. Without determining whether there was probable cause (or a reasonable factual basis to believe there was probable cause), the court cannot know whether the statement was baseless or not. For instance, if instead of sending Detective Brown, Detective Armon himself had gone to the flat and made the same remark, whether or not his statement that he could get a warrant was "genuine" would have to turn on whether he had a reasonable basis for believing there was probable cause. He could not just refer to some other officer's representations to him to establish "genuineness."

In this case, the testimony established that Armon specifically instructed Brown to go to the 944B flat and *get consent* to search. Brown also said that Armon told him there was enough to get a warrant, but Brown admitted he had no knowledge of any of the facts that would

establish probable cause. If Brown's mere "belief" in this case were enough to establish a genuine statement of intent to obtain a warrant (a "nonbaseless" threat, if you will), there is nothing to stop one officer from telling another officer that there is enough to get a warrant when there really isn't, just to get consent. In other words, since an officer on the scene cannot lie to the occupant that he's going to go get a warrant when he knows there isn't probable cause, then that same lie cannot be permitted simply because the police compartmentalize who knows what. The way to thwart this potential cat's-paw-like circumvention of the rule is to determine whether there was a reasonable factual basis on which to conclude there was probable cause. This is consistent with our previous case law. *See White*, 979 F.2d at 542 & n.1 (finding no evidence that police intended to coerce with an empty threat and noting that the police obtained a search warrant for another search of the residence the following day); *Duran*, 957 F.2d at 502 (finding the threat to obtain a warrant did not vitiate consent because it was "firmly grounded" and the police had probable cause); *United States v. Talkington*, 843 F.2d 1041, 1049 (7th Cir. 1988) (finding consent invalid where police lied in claiming that they were in the process of applying for a search warrant).

We are not suggesting one way or the other as to what the officers were truly doing in this case; we are just saying it was error for the district court not to examine whether there was a factual basis for the police to believe they had probable cause to get the search warrant. If there was, then there was a genuine intention to get a warrant and the statement did not vitiate consent. On the other

hand, if, on remand, the district court determines the police had no reasonable factual basis to believe they had probable cause then there was necessarily a baseless/pretextual threat that may render Smith's consent involuntary. As it stands, the district court failed to make a determination (and the prosecution did not present the relevant evidence) on this issue, thus we must remand.

### III. Conclusion

We VACATE the order denying the defendant's motion to suppress and REMAND to the district court for treatment consistent with this opinion.[1]

---

[1] Let us be clear that our instant decision is not a final determination on the merits of the district court's denial of Hicks's motion to suppress. We anticipate that on remand the government may seek the opportunity to supplement the suppression hearing testimony to address the probable cause concern we discussed *supra*. Regardless of whether the hearing is reopened for this purpose, we expect that the district court will consider anew whether the expressed intention to obtain a warrant was genuine or pretextual in light of this opinion, and then, accounting for its determination on that question, reassess, under the totality of the circumstances, whether Smith's consent was voluntary. If there is a subsequent appeal, it should be returned to this panel as a successive appeal under Operating Procedure 6(b).

---