**UNITED STATES of America,
Plaintiff,**

v.

**Jeovante JONES, Defendant.**

**No. 09–cr–23–bbc.**

United States District Court,
W.D. Wisconsin.

Aug. 18, 2009.

Robert Anderson, United States Attorney's Office, Madison, WI, for Plaintiff.

## OPINION AND ORDER

### BARBARA B. CRABB, District Judge.

Defendant Jeovante Jones has entered a plea of guilty in this court to being a felon in possession of a firearm, but he has reserved his right to challenge Magistrate Judge Stephen Crocker's recommended denial of defendant's motions to suppress evidence gathered during a warrantless search of his girlfriend's apartment and to suppress his confession as a fruit of the illegal search. The only disputed issue is whether defendant's girlfriend gave voluntary consent to the search of her apartment on July 18, 2008. I conclude that the magistrate judge was correct in his conclusion that she did. Accordingly, I will deny defendant's motions.

## BACKGROUND

In the summer of 2008, the Beloit, Wisconsin police suspected defendant Jeovante Jones of drug dealing. During the month of July, the police conducted three controlled buys in which defendant sold small quantities of crack cocaine to a confidential informant at three different locations. The informant told police that defendant lived in Beloit with his girlfriend at Unit 2, 1993 Colony Court and that the informant lived in the same complex but had never bought any drugs from defendant there.

Hoping to arrest defendant at the apartment on July 18, the police had the informant order crack from defendant for pickup at the Colony Court address. The police stood by, hidden in a windowless panel van and around the perimeter of the apartment complex. The stage was set for the arrest. At about 9:30 p.m., defendant and his girlfriend, Ethlyn Joseph, drove into the parking lot in a Dodge Durango. They were followed closely by the police raid van.

When defendant realized who was behind him, he jumped out of the car and ran, leaving Joseph and several children behind in the car. As officers pursued defendant, officer Halvorsen concentrated on Joseph. Halvorsen testified that he approached the Durango with his gun in the "low-ready" position, that is, aimed at the ground. Joseph testified that Halvorsen aimed the gun straight at her, while yelling, "I told you I was going to come back. Get on the ground. I told you I was going to get you." Joseph testimony, Tr., dkt. # 33, at 106. Joseph obeyed the order to get on the ground. Halvorsen delayed handcuffing her, because no other officer was around to provide cover, but at some point, he decided to go ahead even without help. A short while later, Officer Andrew Arnold arrived and turned his attention to Joseph. Meanwhile, two of Joseph's children and a nephew remained in the vehicle.

Within ten to 15 minutes of talking with Joseph, Arnold secured her consent to search her apartment. He told her that if she consented, the process would go more quickly. The subsequent search turned up the evidence that defendant seeks to suppress.

## OPINION

■ The government bears the burden of showing that Joseph acted voluntarily when she agreed to the search. *United States v. Hicks,* 539 F.3d 566, 570 (7th Cir.2008) (citing *United States v. Johnson,* 495 F.3d 536, 541 (7th Cir.2007)). The determination rests on the totality of the circumstances, including the age, education, and intelligence of the consenting individual; whether the person was advised of her constitutional rights; how long she was detained before giving consent; whether consent was immediate or prompted by repeated requests; whether

there was any physical or psychological coercion; and whether the person giving consent was in custody at the time. *Id.; see also United States v. Griffin,* 530 F.2d 739, 742 (7th Cir.1976).

■ As the magistrate judge pointed out in his report, the parties take very different views of the facts. Ultimately, the determination of what happened comes down to believing either the police or Joseph. In this case, it was legitimate to find, as the magistrate judge did, that the story told by the police was more credible than Joseph's. Joseph has had a number of encounters with the Beloit police, her disdain for the Beloit police is well documented and she had reason to protect defendant.

Defendant objects to several factual findings that the magistrate judge made in situations in which the police and Joseph gave contradictory testimony. The first relates to a difference of opinion about how close the police van pulled in behind defendant's vehicle, but I see no reason to discuss it. Whether it was so close behind defendant's vehicle that Joseph could not have raised the back door of the vehicle is irrelevant to the issues in dispute.

Of more relevance is the disagreement over the officers' treatment of Joseph, including Halvorsen's handling of his gun, his failure to handcuff Joseph immediately, Arnold's alleged removal of her handcuffs and her eventual consent to a search of her apartment. Having read the transcript, as well as the magistrate judge's report and recommendation, I am not persuaded that it was error for the magistrate judge to find the officers's testimony more credible than Joseph's. Joseph had strong reasons to advance a claim of coercion; Halvorsen and Arnold had much less stronger reasons to shade their stories. Overall, Joseph's testimony is less believable than that of Halvorsen and Arnold.

Defendant contends that Halvorsen's lack of credibility is shown by his testimony that he delayed handcuffing Joseph after he had ordered her to the ground. If Halvorsen was so concerned for his own safety, defendant asks, why would he not have immobilized Joseph immediately by handcuffing her hands behind her back?

The answer is straightforward. As Halvorsen explained, he was the only officer on the scene; if he started handcuffing Joseph, there would be no officer to provide cover while he did so. Tr., dkt. # 33, at 20. As time went on, however, he decided he had to handcuff her, whether or not he had cover. *Id.*

■ Defendant calls it error for the magistrate judge to have found that, in an effort to gain Joseph's cooperation, Officer Arnold removed her handcuffs when he started talking to her. Defendant points out that Joseph testified that she was in handcuffs during the entire interview with Arnold and neither Halvorsen nor Arnold mentioned the removal of Joseph's handcuffs in their reports. The omission from the police report of any mention of handcuff removal raises no red flags. It is not unusual for a police report to omit some of the less-important details of a fast-moving operation like the one on July 18.

Defendant disputes the magistrate judge's finding that Joseph's children and nephew were not crying or visibly agitated during Halvorsen's and Arnold's encounters with Joseph, but, for the reasons I have stated, the magistrate judge was entitled to disbelieve Joseph on this point. Both Halvorsen and Arnold testified that they did not observe any crying or screaming by the children during the relatively short time they were in the car without their mother.

■ Defendant is correct that Arnold testified only that he told Joseph the

search process would be expedited if she consented to the search. He did not testify that he told her that if they had to get a warrant, the police would not allow anyone to remain in the residence until the warrant was obtained so that they could preserve evidence from possible destruction, whereas if Joseph consented to the search, everyone could stay in the apartment while the search was going on. R & R, dkt. # 37, at 3–4. It is unclear how this correction would help Joseph. Neither version demonstrates coercion. Giving a person truthful information about the consequences of refusing to consent to a search is not coercion. *E.g., United States v. Johnson,* 495 F.3d 536, 542 (7th Cir.2007) (not coercion to advise subject that if he does not consent to search, agents would have to secure his house, limiting residents' ability to enter and leave).

■ Joseph testified that she consented only because Arnold told her he would have to call Child Protective Service to come to take her children if she did not consent. Joseph Testimony, Tr., # 33, at 109. The magistrate judge was justified in choosing to disbelieve Joseph's statement and crediting Arnold's testimony that he did not make such a threat. Again, this point is of little importance, since it is not even clear that Arnold's telling her he would have to call Child Protective Service would have been a threat. Telling a person in Joseph's position the predictable consequences of her failure to grant consent is a fair tactic, not one designed to overbear her will.

As to Joseph's testimony that Arnold would not let her go to her children, would not let her ask her sister to get the children and told her "I guess your kids are going to sit here and watch their mother in handcuffs until Child Protective Service come and the search warrant is brought," the magistrate judge did not have to believe this testimony, for the reasons stated previously and also because the undisputed evidence is that Joseph gave her written consent to a search so soon after the police van pulled into the parking lot at Colony Court.

■ Defendant has not shown that Joseph lacked the age, experience or intelligence to give her informed consent, that she was detained for any extended length of time, that her consent was prompted by so many repeated requests as to overbear her will or that there was any physical or psychological coercion, beyond what any person in Joseph's position would have felt under the circumstances. She had to be concerned about her children and what was best for them, but this was not a factor attributable to the police. Considering the factors that go into a voluntary consent, I am persuaded that the magistrate judge made the right decision about the voluntariness of Joseph's consent.

■ The final issue defendant raises is the validity of the officers' intention to obtain a search warrant if Joseph did not give permission for a search of her apartment. He argues that it was not legitimate for the officers to tell Joseph they would get a search warrant if she did not consent, because they did not have probable cause to believe that they would find incriminating evidence there. Defendant makes a strong argument in support of his position that the police had no probable cause for believing that defendant sold drugs from the apartment and would have left any incriminating cooking paraphernalia, packaging materials or drugs in the building. The police had no information that the informant had ever made a drug sale from Joseph's apartment and they knew that the preceding three sales had taken place at locations other than Colony Court. They did, however, have information that defendant was spending the majority of the nights at the Colony Court

and they knew that, as a general rule, persons who sell crack cocaine need a place to cook it and that such a place is usually one that is private, has cooking facilities and is readily available. This was enough to give the officers a reasonable basis for believing that they had sufficient probable cause to support a warrant application. *Hicks,* 539 F.3d at 571–72.

### ORDER

IT IS ORDERED that the report and recommendation of United States Magistrate Judge Stephen L. Crocker is ADOPTED by the court, with the minor changes noted above, and that defendant Jeovante Jones's motions to suppress the evidence seized on July 18, 2008 from Ethlyn Joseph's apartment and his subsequent confession are DENIED.

### REPORT AND RECOMMENDATION

STEPHEN L. CROCKER, United States Magistrate Judge.

### REPORT

The grand jury has charged defendant Jeovante Jones with being a felon in possession of a firearm. Beloit police seized the firearm during a search of Jones's girlfriend's apartment undertaken pursuant to consent provided by the girlfriend, Ethlyn Joseph. Before the court is Jones's motion to suppress the firearm and other evidence seized during the search, as well as his post-arrest confession derived from the search. Jones contends that the police coerced Joseph to consent to the search. *See* Dkt. 16. The government responds that there was no coercion and argues inevitable discovery as a safety net. The government is correct on both points and I am recommending that the court deny Jones's motion.

On June 15, 2009, this court held an evidentiary hearing. Having heard and seen the witnesses, having judged their credibility and having reviewed the relevant documents, I find the following facts:

### Facts

In July 2008 defendant Jeovante Jones was the target of a drug trafficking investigation by the Beloit Police Department. Between mid-June, 2008 and July 18, 2008, a confidential informant purchased small quantities of crack cocaine from Jones three times at different locations. The informant reported that Jones lived with his girlfriend at 1993 Colony Court, Unit 2, although the informant never had bought drugs from Jones there. In early July, 2008 Jones had provided this address as his residence following his arrest in an unrelated matter.

The police decided to conclude their investigation and arrest Jones following a fourth controlled drug buy on July 18, 2008. They contemplated preparing a conditional search warrant for the Colony Court residence but decided to wait to see what happened at the scene. The plan was for the informant to order crack from Jones but not pay for it; upon receipt of the crack, the police would swoop in and arrest Jones. That evening the informant drove to the Colony Court apartment complex and waited in his car in the parking lot. Police officers were poised nearby in a windowless panel van with running boards camouflaged to look like a handyman's work vehicle. Other officers were scattered about the perimeter of the apartment complex.

At about 9:30 p.m. Jones returned to the apartment complex with his girlfriend, Ethlyn Joseph, in her Durango. They had just run some errands prior to going out for the evening. They had Joseph's two youngest children and a young nephew (all between three and four years old) in the SUV, ensconced in booster seats. Joseph's sister was in the apartment with two older children. After Joseph drove

the Durango into the parking lot, Jones stepped out and away to meet privately with the informant at his car. Jones provided crack to the informant and the officers moved in. The panel van pulled up and stopped behind both vehicles, about 15 feet from the Durango. Three officers spilled out the side door. Jones eluded them and sprinted to an adjoining cornfield.

Officer Thomas Halvorsen was left alone on the scene to deal with Joseph and her children (whom Officer Halvorsen did not see at first). Officer Halvorsen approached the Durango with his firearm drawn in the "low-ready" position, pointed toward the ground. He ordered Joseph out of the car and face-first onto the ground. Joseph, a 28 year old high school graduate with some college, had had repeated previous contacts with the criminal justice system, including several convictions. Joseph, however, was flummoxed by the sudden appearance of the police, and she did not immediately comply, instead challenging Officer Halvorsen's orders. After about five demands, Joseph unhappily complied. Officer Halvorsen cuffed Joseph's hands behind her back, helped her to her feet and brought her to the police van. Other police officers converged on the scene. A female police sergeant patted down Joseph for weapons and found nothing. Joseph was allowed to sit on the running board of the police van with her feet on the ground. The three children remained in the car; two appeared to be sleeping, one was standing in his seat. None was crying or visibly agitated.

By then Officer Andrew Arnold, the leader of this operation, had returned from the cornfield where officers had captured Jones. Hoping to enlist Joseph's cooperation, Officer Arnold removed her handcuffs and asked whether she was in need of medical attention or was okay to chat. Upon determining that Joseph was okay,

Officer Arnold explained what they were doing and why they had arrested Jones. Joseph verbally distanced herself from any drug trafficking by Jones. Officer Arnold advised Joseph that the police intended to search her residence and would obtain a search warrant if necessary. Officer Arnold estimated that it would take at least two hours to obtain a warrant, although it's not clear whether he shared this estimate with Joseph. Officer Arnold did tell Joseph that if they had to get a warrant, the police would not allow anyone to remain in the residence until the warrant was obtained so that they could preserve evidence from possible destruction. If, however, Joseph consented to the search, then everyone could stay in the apartment while the search went forward. Officer Arnold did not threaten to call Child Protective Services. Officer Arnold did not refuse any request for the children to be taken into the apartment; in fact, he was not aware that Joseph's sister was in the apartment.

Joseph orally consented to the search. Officer Arnold prepared a consent form and read it aloud to Joseph and asked her if she had any questions about it. She did not. Officer Arnold gave the form to Joseph. She looked it over and signed it. The form states:

> I, **Ethlyn L. Joseph,** HAVING BEEN INFORMED OF MY CONSTITUTIONAL RIGHTS NOT TO HAVE A SEARCH MADE OF THE PREMISES HEREINAFTER MENTIONED WITHOUT A SEARCH WARRANT AND OF MY RIGHT TO REFUSE TO CONSENT TO SUCH A SEARCH, HEREBY AUTHORIZE **Officer Arnold**
>
> AND **Officer Mackey,** BELOIT POLICE OFFICERS, WHO HAS IDENTIFIED THEMSELVES AS BELOIT POLICE OFFICERS, TO

CONDUCT A COMPLETE SEARCH OF MY PREMISES.... THIS WRITTEN PERMISSION IS BEING GIVEN BY ME TO THE ABOVE–NAMED OFFICERS VOLUNTARILY AND WITHOUT THREATS OR PROMISES OF ANY KIND.

Gov. Exh. 5.

The time elapsed from the police jumping from the van to chase Jones through Joseph's signing the consent form was 10 to 15 minutes. Officer Arnold's conversation with Joseph had lasted five to 10 minutes. Their conversation was calm and cordial. Joseph never refused consent and was not cajoled into consenting to the search or signing the form.

The officers entered the residence with Joseph and her children. Joseph, her sister and their children sat in the living room watching television while the officers searched. The officers recovered contraband that has been charged against Jones in this case.

Later at the police station, officers confronted Jones with the evidence seized from the residence, prompting self-inculpatory statements.

## ANALYSIS

Ethlyn Joseph and the Beloit police officers provided irreconcilable versions of what occurred in the parking lot last July, and the validity of Joseph's consent hinges on which version I credit. Each side takes potshots at the credibility of the opposition's witnesses; indeed, Jones accuses the police of "a clear pattern of police harassment directed at Ms. Joseph," dkt. 34 at 6, n. 1. Duly noted, but not proved. While nobody got everything right, I have found that the police got it more right than Joseph did. As the facts found above reveal, I have credited the police witnesses' accounts of what occurred that night. But even if I had found Joseph more credible, I still would recommend that the court deny Jones's motion to suppress because the police could have and would have obtained a search warrant in the absence of Joseph's consent.

Jones contends that the police coerced Joseph into consenting to the apartment search. The government bears the burden of proving that Joseph consented voluntarily. Voluntariness is based on the totality of circumstances, including Joseph's age, education, and intelligence, whether she was advised of her constitutional rights; whether and how long she was detained before giving consent; whether consent was immediate or prompted by repeated requests, and whether there was any physical or psychological coercion. *United States v. Hicks*, 539 F.3d 566, 570(7th Cir.2008).

Jones does not dispute that Joseph was of sufficient age, education and intelligence to be capable of providing valid consent to search. Joseph was an articulate and dynamic witness at the evidentiary hearing, holding her own during cross-examination. Jones does not dispute that the waiver form that Joseph signed advised her that she had the right to refuse to consent and to insist upon a warrant. Joseph, however, denies that the police read it to her, or that she read it herself, but rather just signed it because the police told her to do so after breaking her will.

They did this, claims Joseph by unnecessarily humiliating and handcuffing her in front of her crying children, hectoring her to consent despite oft-repeated refusals, and threatening to call Child Protective Services if Joseph made them apply for a warrant. Having heard from all of the witnesses, I have not credited any of this testimony. Police witnesses do not have a monopoly on the truth and they are not inherently more credible than civilian witnesses. But here, the officers' testimony

was sufficiently consistent, logical and believable on the material points for me to credit it over Joseph's hyperbolic and uncorroborated testimony.

■■ As for Officer Arnold's threat to obtain a search warrant if Joseph withheld consent "baseless threats to obtain a search warrant may render consent to search involuntary, [but] when the expressed intention to obtain a warrant is genuine and not merely a pretext to induce submission, it does not vitiate consent to search." *Hicks*, 539 F.3d at 571. Intent to obtain a warrant is genuine if the police have probable cause or a reasonable factual basis to believe there was probable cause to support a warrant. To avoid a potential cat's paw by police, the court must determine if there was a reasonable factual basis upon which to conclude there was probable cause. *Id.* at 572.

■ The information in the record is sufficient to establish a reasonable factual basis for the police to believe there was probable cause to support the warrant.[1] Probable cause exists when there is sufficient evidence to induce a reasonably prudent person to believe that the search will uncover evidence of a crime. When police rely on an informant's tip, relevant factors include the extent of police corroboration, the amount of first-hand observation by the informant, the amount of detail provided by the informant, the recency of the informant's information, and whether the police presented the informant to the court for a credibility determination. *United*

States v. Sims, 551 F.3d 640, 644 (7th Cir.2008). In Jones's case, the CI already had three recent controlled crack buys into Jones and had obtained more crack from him on July 18 in the parking lot of the Colony Court complex. A controlled buy, when executed properly, is a reliable indicator as to the presence of illegal drug activity. *United States v. Sidwell*, 440 F.3d 865, 869 (7th Cir.2006). Here, there were four within a month. In the case of drug dealers, evidence is likely to be found where the dealers live. *United States v. Hoffman*, 519 F.3d 672, 676 (7th Cir.2008). Jones himself recently had reported 1993 Colony Court, Apt. 2 as his residence, and the circumstances preceding his arrest—returning to the apartment mid-evening with his girlfriend—corroborated this report. Also, the police could have used information learned from Joseph to bolster their evidence that Jones lived with her, because this is information Officer Arnold would have known at the time he applied for a warrant in the event that Joseph did not consent to the search.

■ This segues to the government's invocation of the inevitable discovery doctrine, which imposes a higher burden of persuasion: the government must prove that "a warrant would certainly, and not merely probably, have been issued had it been applied for." *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir.2008). Although Jones argues otherwise, the evidence listed above sufficiently established probable cause to search 1993 Colony

---

1. Indeed, Officer Arnold testified that the police had mulled obtaining an anticipatory search warrant, but decided to wait and see what happened at the scene. Jones challenges this claim, but it's a logical and efficient approach. Preparing a search warrant affidavit and jumping through the hoops to obtain a warrant is time-consuming and toilsome. That's why police often gamble on obtaining consent at the scene before starting the warrant process. (It's also why police to

push hard for consent, something that courts must scrutinize closely.) A corollary is that people who are asked to consent often agree because the alternative is to be locked out of their residence for a couple of hours before the search even begins. But choosing between two unpalatable choices does not render the decision involuntary. *See United States v. Miller*, 450 F.3d 270, 272–73 (7th Cir.2006).

Court, Unit 2 so that a search warrant would certainly have issued if requested. This constitutes a second ground to deny Jones's motion to suppress.

Finally, Jones's motion to suppress his post-arrest statements is tied to his claim that these statements were derived from an illegal search. *See United States v. Budd,* 549 F.3d 1140, 1144 (7th Cir.2008). Because the search was legal, Jones's statements should not be suppressed.

## RECOMMENDATION

Pursuant to 42 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court deny in all respects defendant Jeovante Jones's motion to suppress evidence.

Entered this 10th day of July, 2009.