**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 23, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

MICHAEL SCOTT MORRIS,

    Defendant - Appellant.

No. 17-6223
(D.C. No. 5:16-CR-00220-F-1)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **KELLY**, and **McHUGH**, Circuit Judges.
_____

Defendant-Appellant Michael Scott Morris entered a conditional plea of guilty to being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), and was sentenced to 60 months' imprisonment and three years' supervised release. On appeal, he challenges the district court's denial of his motion to suppress evidence discovered during a warrantless search. He argues that his mother's consent to search his home was not voluntary and contends that no exigent circumstances justified a warrantless search. Our jurisdiction arises under 28 U.S.C. § 1291 and we affirm.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

**Background**

In the early morning hours of June 24, 2016, Officers Clayton Hobbs and Andrew Peck of the Chickasha Police Department responded to a report of a shooting incident at Mr. Morris's home.  3 R. 13.  Two witnesses called the police to report that Mr. Morris had fired shots from his porch in their direction as they passed in their vehicle.  Id. at 13, 32, 61.  Officer Hobbs reached the scene shortly before 1:30 a.m.  Id. at 12.  Officer Peck arrived soon after.  Id. at 14–15.  Both officers were wearing body cameras.  Id.

After the officers arrived on the scene, Officer Peck announced their presence over an intercom and ordered Mr. Morris to exit the house with his hands up.  1 Supp. R. 1. Debra Morris — Mr. Morris's mother — appeared on the porch after Officer Peck repeated the command several times.  Id.  Both officers then directed Ms. Morris to approach them from the porch.  Id.

Officer Hobbs asked Ms. Morris if she was "ok," and Ms. Morris responded that she was, but that she suffers from rheumatoid arthritis and was "real groggy" because she had taken medication to alleviate her pain before bed.  Id. at 2.  Ms. Morris moved with some difficulty because of her arthritis, and Officer Hobbs brought Ms. Morris to Officer Peck's patrol car where she leaned on the car for support during questioning.  Id.

In response to questions from Officer Hobbs, Ms. Morris stated that she was the only person in the house and had not seen her son in roughly an hour.  Id.  Officer Hobbs asked for the first time whether he and Officer Peck could enter the house.  Id. at 3.  Ms. Morris protested that her dog — a pit bull — would not let the officers enter.  Id.  Officer

2

Hobbs responded that "we're going to have to get in that house" and explained that he and Officer Peck had questions for Mr. Morris and needed to clear the house to make sure Mr. Morris was not inside. Id. Ms. Morris repeated that she had not seen her son since he left an hour before — she told Officer Hobbs that she had taken pills before lying down to sleep and had maybe "doz[ed]" for 10 or 15 minutes before the officers arrived. Id. at 5.

Officer Hobbs explained again that they needed to search the house and told Ms. Morris that her son was accused of firing a handgun at a passing car. Id. Once again, she claimed no one was inside. Id. at 6. When he asked her for the second time whether she was giving consent to search the house she answered "No." Id. Officer Hobbs responded, "Ok, then we'll get a warrant." Id. He also told her that "[i]f he's in there and you're not tellin' me, I'm takin' you to jail." Id. Ms. Morris again denied that her son was in the house. Id.

Officer Hobbs then asked Ms. Morris for the third time whether she was giving consent to enter the house and told Ms. Morris that all she had to do was say "yes or no." Id. (internal quotation marks omitted). Ms. Morris responded again that her son was not in the house. Id. at 7. Officer Hobbs reiterated that they could obtain a search warrant and search the house even without her consent. Id.

Officer Hobbs reassured Ms. Morris that officers would do their best not to hurt her dog if they entered the house. Id. Approximately six minutes after the police began their conversation with Ms. Morris, an officer asked for the final time whether Ms.

3

Morris was telling the police that she would give consent to search the house for her son and she responded "Yeah." Id. at 8. After giving her consent, Ms. Morris confirmed to the officer that the consent was "of [her] own free will." Id.

Police then entered the home and found both Mr. Morris and several firearms and homemade silencers, including the pistol he allegedly fired. 3 R. 139–41. In an oral ruling denying the motion to suppress, the district court found (1) that the initial consent given by Ms. Morris to enter the house and look for Mr. Morris was free and voluntary; (2) that Mr. Morris's later consent to search the house was free and voluntary; and (3) that, even in the absence of valid consent, exigent circumstances justified the warrantless entry into the house. 3 R. 137, 139, 142–43.

**Discussion**

We review a district court's determination that consent to search was voluntary for clear error. See United States v. Thompson, 524 F.3d 1126, 1133 (10th Cir. 2008). The evidence is viewed in the light most favorable to the district court's decision. See United States v. Najar, 451 F.3d 710, 717 (10th Cir. 2006).

Warrantless searches are presumptively unreasonable under the Fourth Amendment. See Illinois v. Rodriguez, 497 U.S. 177, 181 (1990). That said, a well-recognized exception is an occupant's consent to search. See id. There are two requirements. First, consent to search must be given by one with actual or apparent

4

authority to consent. See United States v. Cos, 498 F.3d 1115, 1124 (10th Cir. 2007). Second, the consent must be given freely and voluntarily — in other words the consent must be the product of the individual's free will, not of coercion or intimidation on the part of law enforcement. See United States v. Jones, 701 F.3d 1300, 1317–18 (10th Cir. 2012). Voluntariness is assessed under the totality of the circumstances. See id. The government bears the burden of proving consent was voluntary. See id. at 1318.

Here, Mr. Morris argues the consent given by his mother was not free and voluntary, but rather was the product of coercion on the part of the police. He points to his mother's compromised medical condition, her "grogginess," and the repeated threats by the police to retrieve a warrant and take her to jail if she did not consent.

The district court reviewed the transcript of the officers' interaction with Ms. Morris and the actual video footage of the encounter. It also observed Ms. Morris when she testified at the suppression hearing. Under the clear error standard, we may only overturn the district court's determination if its decision was unsupported by the factual record or, after reviewing all of the evidence, we are firmly convinced the district court erred. See Middleton v. Stephenson, 749 F.3d 1197, 1201 (10th Cir. 2014).

The district court applied the correct legal standard for determining voluntariness after considering the totality of the circumstances. 3 R. 137. It noted a disconnect between the transcript that appeared "noticeably more coercive" than the "noticeably courteous" interaction captured by the video. Id. at 129. Characterizing Ms. Morris's appearance and demeanor in the video as "responsive," "mentally alert," "reasonably

5

articulate," and "discernibly intelligent," it rejected the contention that Ms. Morris was so affected by the sleep aid she had taken or so afflicted by arthritis that her will could be easily overborne. Id. at 130. Ms. Morris did not seem likely to be flustered or intimidated according to the district court's observation. Id. at 136.

As for the argument that Ms. Morris was coerced into consenting by the officers' threats to get a warrant, the district court found that there was nothing "inappropriate, misleading, or coercive" in that statement. Id. An officer can express an intention to get a warrant without rendering consent to search involuntary, as that expression is only one factor among many in the totality of the circumstances. Cf. United States v. Hicks, 650 F.3d 1058, 1064 (7th Cir. 2011) ("Yet when the officer's 'expressed intention to obtain a warrant is genuine, and not merely a pretext to induce submission, it does not vitiate consent to search.'" (quoting United States v. Hicks, 539 F.3d 566, 571 (7th Cir. 2008))).

Finally, Mr. Morris argues that the officers' threats to take Ms. Morris to jail were coercive. While significant, it is not inappropriate or coercive for officers to apprise an individual of the legal consequences of her actions and it is merely one factor among many in the totality-of-the-circumstances analysis. Cf. United States v. McNeal, 862 F.3d 1057, 1064 (10th Cir. 2017) (rejecting the defendant's claim that confession was coerced for this reason in Fifth Amendment context). Here, the district court noted that the threat of jail was conditioned on Ms. Morris *lying* about the presence of her son in the house, not on her failure to consent to a search. 3 R. 118. That is a reasonable interpretation.

Because the district court's determination that Ms. Morris's consent was voluntary will be affirmed, we need not reach the question whether exigent circumstances existed to justify the officers' search.

AFFIRMED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge