In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-1956

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL ALLAN HANCOCK,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:13-cr-00128-bbc-1 — **Barbara B. Crabb**, *Judge*.

ARGUED NOVEMBER 13, 2015 — DECIDED DECEMBER 28, 2016

Before POSNER, RIPPLE, and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Michael Allan Hancock was indicted on one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), and on one count of possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5841, 5845(a)(2), and 5861(d). Before trial, Mr. Hancock challenged the search warrant that had led to his arrest by requesting a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). In sup-

port of that motion, he maintained that critical evidence bearing on a confidential informant's credibility had been omitted from the probable cause affidavit. Following the magistrate judge's recommendation, the district court denied the motion.

Mr. Hancock also moved in limine to preclude the use of prior convictions as the basis for the § 922(g)(1) count. He maintained that the release document issued to him by the Colorado Department of Corrections lulled him into believing that all of his rights, including the right to possess a weapon, had been restored. The district court, assessing the release document within its four corners, held that the document did not communicate any restoration of rights to Mr. Hancock. A jury later convicted Mr. Hancock on both counts of the indictment. The court imposed concurrent sentences of 120 months on each count.[1]

Mr. Hancock now challenges both of these rulings. We conclude that, viewed in its totality, the probable cause affidavit amply supports the issued search warrant. We also agree with the district court that, on its face, the release document does not speak to the restoration of rights. We therefore affirm Mr. Hancock's convictions.

---

[1] The jurisdiction of the district court was premised on 18 U.S.C. § 3231.

# I

## BACKGROUND

### A.

On August 14, 2013, law enforcement officers executed a no-knock search warrant on the property of Arthur Erickson. This property included a residence, out buildings, and surrounding land. Mr. Hancock served as a caretaker of this property during the winter months. When Erickson was away, he lived in the residence; when Erickson was at home, Mr. Hancock stayed in a recreational vehicle parked on the property.

The search warrant, issued earlier the same day, was supported by the probable cause affidavit of Chris Drost, an investigator with the St. Croix Sheriff's Office with fifteen years' experience. In that affidavit, Investigator Drost recounted that he had interviewed Mr. Hancock (also known as "Munchy") in June 2013, while Mr. Hancock was detained at the St. Croix County Jail. During that interview, Mr. Hancock referred to himself as a "one percenter," which Investigator Drost understood to mean that Mr. Hancock was affiliated with the "Outlaw Motorcycle Gang."[2] Mr. Hancock further informed Investigator Drost that he previously had been charged with a variety of crimes. Mr. Hancock also acknowledged that, on the day he had been brought to jail, he was with his girlfriend, who was identified (using police records) as Sarah Jo Davis.

The affidavit also contained information provided to Investigator Drost by a confidential informant, Jeremy Ray Peabody. In June 2013, Peabody began giving information about

---

[2] R.17-1 (Application for Search Warrant) at 4.

drug activity and stolen goods on the Erickson property to In-vestigator Drost. Peabody previously had provided infor-mation to the St. Croix County Sheriff's Office for fifteen years, and this information had led to several felony arrests and convictions. He reported to Investigator Drost that, ap-proximately ten months earlier, Robert Graves had intro-duced Mr. Hancock to him and that Graves had identified Mr. Hancock as his supplier. Peabody continued that, at their first meeting, he had used methamphetamine with Mr. Han-cock and had befriended him in the hope that he would be able to purchase drugs directly from Mr. Hancock and cut out the middleman. After two buys with Graves, Peabody was able to purchase drugs directly from Mr. Hancock.

Peabody subsequently made more than twenty visits to the Erickson property to purchase methamphetamine from Mr. Hancock. He was, consequently, able to provide detailed information about Mr. Hancock, his business, and the prop-erty. Peabody explained that Mr. Hancock and Davis lived in an RV on the property and that Mr. Hancock had access to all of the buildings on the property, including a "large pole shed"[3] from which he sold drugs. Peabody further reported that he had witnessed approximately forty to sixty drug sales to other individuals on the property, that Mr. Hancock had accepted stolen property as well as cash from his customers, and that Mr. Hancock had informed him that the property was stolen. Peabody had seen the stolen items (including a car, ATVs, and chainsaws) on the Erickson property. He also warned Investigator Drost that he considered Mr. Hancock to be dangerous, in part because of Mr. Hancock's affiliation

---

[3] *Id.* at 5.

with the Outlaw Motorcycle Gang. Peabody "advised … that within the last several months he ha[d] seen a handgun in Munchy's living quarters located in the RV" and that Mr. Hancock had access to the handguns inside the Erickson residence.[4] Peabody had seen Mr. Hancock use the weapons to "shoot[] at lights and shadows on the property."[5]

Peabody also provided Investigator Drost with cell phone numbers for Mr. Hancock and Davis. He said that Mr. Hancock used Davis's cell phone to conduct his drug activities. Based on this information, Investigator Drost had secured a search warrant for Davis's cell phone number on July 15, 2015. The search revealed numerous text messages with references to drug transactions during the week prior to the application for the warrant to search the Erickson property.

The probable cause affidavit also included information provided by Rachelle Lowrie. Lowrie had met Mr. Hancock in June 2013 through Davis. Lowrie asked Davis how she could purchase methamphetamine from Mr. Hancock and was told that she "could go through Davis to purchase … from Munch[y]."[6] Lowrie further explained that, on August 6, 2013, "she had been driven to [a] court appearance by Detective Funk of the Prescott Police Department" and that

---

[4] *Id.* at 7.

[5] *Id.*

[6] *Id.* at 9.

Mr. Hancock may have seen her.[7] Mr. Hancock later accused her "of being a snitch and informant for the police."[8]

On August 11, 2013, Mr. Hancock and another man, identified as "Shawn," came to Lowrie's residence. Mr. Hancock tied Lowrie to the sofa, sexually assaulted her, and "extinguished lit cigarettes" on her.[9] Mr. Hancock warned her against "snitch[ing]" and threatened her and her daughter with further harm if she reported him to the police.[10] Lowrie believed that Mr. Hancock took from Lowrie prescription medications, jewelry, her wallet, and other items, including pictures of her daughter.

Finally, the probable cause affidavit recounted that, after transporting Lowrie to the hospital, Investigator Drost spoke with the nurse who conducted Lowrie's physical examination. The nurse confirmed that Lowrie's injuries were consistent with what Lowrie had reported to Investigator Drost.

On the basis of this affidavit, a search warrant for the Erickson property was issued. Upon execution of the search warrant, the officers found a short barreled shotgun, shotgun shells, some allegedly stolen property, a small amount of methamphetamine, and some drug paraphernalia.

---

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

**B.**

**1.**

On October 10, 2013, a grand jury returned a two-count indictment charging Mr. Hancock with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1), and with possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5841, 5845(a)(2), and 5861(d). Mr. Hancock moved to suppress the evidence obtained during the execution of the search warrant and requested an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), alleging that the affidavit lacked probable cause, contained material false statements concerning the alleged sexual assault, and omitted material information, namely evidence of Peabody's criminal record and the fact that he was in custody for assaulting a police officer at the time he provided the relevant information. The Government opposed the motion to suppress and the request for a *Franks* hearing.

The magistrate judge recommended that the district court deny the motion to suppress and deny the request for a *Franks* hearing. In the report and recommendation, the magistrate judge identified four categories of evidence in the affidavit that supported the search warrant: (1) Investigator Drost's interview of Mr. Hancock; (2) Peabody's information to the police; (3) Davis's text messages related to drug dealing; and (4) the interview and medical examination of Lowrie. The magistrate judge concluded that Investigator Drost had been reckless in omitting Peabody's criminal convictions from the affidavit. He concluded nevertheless that, even if the evidence of Peabody's criminal history had been included in the probable cause affidavit, the warrant would have issued. Specifically, the magistrate judge noted that Peabody's account had been

detailed and corroborated by other evidence. Moreover, probable cause to search the premises would have existed based on the information provided by Lowrie:

> Lowrie's account, as corroborated in part by the [Sexual Assault Response Team] nurse's report to Investigator Drost … provides a separate and severable basis to search the premises for the articles that Lowrie claims Hancock took from her. Lowrie provided a vivid and detailed account of what happened along with a lengthy and detailed list of what Hancock stole from her and took with him. This court has no reason to doubt this account and it could stand alone as a basis to uphold this search warrant.[11]

The magistrate judge therefore recommended denying the request for a *Franks* hearing and the motion to suppress.

Mr. Hancock objected to the report and recommendation. In his view, the finding of a reckless omission of Peabody's criminal convictions mandated a *Franks* hearing. Notably, Mr. Hancock did not address the magistrate judge's finding that the interview and medical examination of Lowrie provided an independent basis for the search. The district court accordingly held that Mr. Hancock had waived any objection to the finding of the discrete sufficiency of the rape allegations and otherwise adopted the magistrate judge's report and recommendation.

---

[11] R.49 at 30–31.

**2.**

Prior to trial, Mr. Hancock filed a motion in limine to preclude the Government from introducing evidence of his Colorado felony convictions as the factual predicates for the § 922(g)(1) charge. Mr. Hancock argued that, by operation of state law, all of his rights to citizenship had been restored upon his release from prison. Moreover, the Colorado Department of Corrections had provided him with an "unconditional" discharge upon his release.[12] According to Mr. Hancock, because he had been unconditionally discharged, his convictions could not be used as predicate offenses under § 922(g)(1).

The district court denied the motion. It further held that nothing in the document issued by the Colorado Department of Corrections told defendant that any or all of his civil rights had been restored. "Therefore, he was not misled into thinking he could possess a firearm."[13]

A jury convicted Mr. Hancock on both counts of the indictment, and the court imposed concurrent sentences of 120 months. Mr. Hancock timely appealed.

---

[12] R.62-1.

[13] R.88 at 5.

## II

## DISCUSSION

### A.

Mr. Hancock maintains that the district court erred in denying his motion to suppress and his motion for a *Franks* hearing. In reviewing a motion to suppress, "we review legal conclusions *de novo* and factual findings for clear error. Similarly, we review the denial of a *Franks* hearing for clear error, but any legal determinations that factored into the ruling are reviewed *de novo*." *United States v. Glover*, 755 F.3d 811, 815 (7th Cir. 2014) (citation omitted).

We recently have reiterated the standard for granting a *Franks* hearing in *United States v. Mullins*, 803 F.3d 858 (7th Cir. 2015). We explained that

> [a] defendant is entitled to a *Franks* hearing—an evidentiary hearing regarding the veracity of information included in a search warrant application—if he can make a substantial preliminary showing that: (1) the warrant affidavit contained false statements, (2) these false statements were made intentionally or with reckless disregard for the truth, and (3) the false statements were material to the finding of probable cause.

*Id.* at 861–62. This rule applies to omissions as well as affirmative misrepresentations. *Id*. at 862. However, "[i]f sufficient allegations existed warranting the search irrespective of the affiant's alleged errors, a hearing is unnecessary and the motion should be denied." *Id.* We assess the sufficiency of the

allegations supporting the warrant according to the "totality of the circumstances." *Id.* at 861. Specifically,

> [w]hen probable cause is supported by information supplied by an informant, we particularly look to several factors: (1) the degree to which the informant has acquired knowledge of the events through firsthand observation, (2) the amount of detail provided, (3) the extent to which the police have corroborated the informant's statements, and (4) the interval between the date of the events and the police officer's application for the search warrant.

*Id.* at 863 (quoting *United States v. Sutton*, 742 F.3d 770, 773 (7th Cir. 2014)).

Here, the magistrate judge looked to these standards in evaluating whether a *Franks* hearing was warranted. He concluded that Investigator Drost's omission of Peabody's criminal record from the probable cause affidavit was reckless.[14] He therefore "consider[ed] the affidavit, … incorporating omitted material facts, and determine[d] whether probable cause existed." *United States v. Harris*, 464 F.3d 733, 738 (7th Cir. 2006); *see also United States v. Robinson*, 546 F.3d 884, 888 (7th Cir. 2008) (same). The magistrate judge reviewed the information provided by Peabody and concluded that it corroborated Mr. Hancock's statements to Investigator Drost, the text messages, and Lowrie's statement. The magistrate judge also believed that, "[i]n light of Peabody's long-term, intertwined history as both a criminal and a snitch, a court considering the

---

[14] *See* R.49 at 28.

reliability of his information would have to be skeptical but receptive: notwithstanding his personal criminality, Peabody was a long-term, reliable informant."[15] "In this particular case," the magistrate judge continued, "Peabody's lengthy, richly detailed, first-hand report of what Hancock and Davis were doing at the premises—involving precisely-described stolen property, ongoing drug runs to Hastings, followed by sales and consumption on the premises, [and] meth-fueled gunplay … strikes this court as worthy of credence."[16] We perceive no legal error in the magistrate judge's recitation of the applicable standards and no factual error in his thorough consideration of the evidence on which the probable cause affidavit was based.

Mr. Hancock does not point to any specific flaw in the magistrate judge's analysis, which was adopted by the district court as its own.[17] Instead, he claims that our decision in *Glover* mandates a *Franks* hearing every time "substantial adverse information about the informant's credibility" is omitted from a probable cause affidavit. *Glover*, 755 F.3d at 820. This is a misreading of our holding in *Glover*.

In *Glover*, a search warrant had been issued on the basis of an officer's affidavit, which contained the following facts:

> On July 23, 2010, confidential informant "Doe" spoke with Officer Brown regarding a felon, known to Doe as "T.Y.," in possession of two handguns: a black semiautomatic and a black

---

[15] *Id.* at 30.

[16] *Id.*

[17] *See* R.55 at 3–4.

.38-caliber revolver. T.Y. lived at 905 Kedvale in Chicago. Doe said he had seen the guns while in the house the day before and "many times over the course of the last six weeks." Doe said T.Y. needed the guns because he had a "dope spot" (a street-level point of sale) for heroin. Doe also said T.Y. was a member of the Traveler Vice Lords gang and part of a "stick-up crew" who robbed people carrying large amounts of money or drugs.

*Id.* at 814–15. The affidavit, however, "did not include any available information on Doe's credibility," including that he was affiliated with a gang, that he had a lengthy criminal history (including four crimes committed while he was working as an informant), that he "had used aliases when questioned by police officers," and that he had "received payment for providing information to the police in the past." *Id.* at 815.

Applying the totality of the circumstances test set forth in *Illinois v. Gates*, 462 U.S. 213 (1983), we held that a *Franks* hearing was warranted. Looking at the factors that inform a *Franks*-hearing determination, *see Mullins*, 803 F.3d at 863, we noted that the "tip was minimally corroborated," and the informant had "provided little detail." *Glover*, 755 F.3d at 817. Moreover, the "checkered past" of the informant called into question the reliability of the information, namely Doe may have "report[ed] Glover merely because of gang rivalries." *Id*. Under these circumstances, "[t]he complete omission of information regarding Doe's credibility [was] insurmountable." *Id*. at 816.

Unlike the information in *Glover*, however, here the probable cause affidavit contained specific information concerning

Peabody and his reliability as a witness.[18] As well, the information provided by Peabody differed in quantity and quality from that provided in *Glover*: Peabody gave highly detailed descriptions of Mr. Hancock's activities based on Peabody's frequent, personal interactions with Mr. Hancock. Furthermore, Mr. Hancock's criminal activities were corroborated by the text messages from Davis's phone, Lowrie's report of assault to the police, and Mr. Hancock's own prior statements to Investigator Drost, in which he referenced his gang affiliation and admitted to a long line of arrests. We therefore conclude, as we did in *Mullins*, that this other evidence of reliability distinguishes the present situation from *Glover*. *See Mullins*, 803 F.3d at 864 (holding that *Glover* was "readily distinguishable" because "the search warrant in *Glover* was issued based almost entirely on the informant's report," but "[h]ere, by contrast, … the critical information was corroborated by the officers' firsthand observations").

We also note that, in the case before us, there are not the same type of concerns with Peabody's credibility as there were with the informant in *Glover*. Specifically, there is no evidence that Peabody was involved in a different—and perhaps rival—gang, that he had attempted to deceive the police, or that he was expecting remuneration for his cooperation.

---

[18] *See* R.17-1 at 4–5 (identifying Peabody as "a known credible confidential informant," who, "over the course of the last fifteen years, has provided the St. Croix County Sheriff's Office with information on several burglaries leading to felony arrests and convictions," and who had "made a minimum of 3 controlled drug buys for the St. Croix County Sheriff's Office and the West Central Drug Task Force, leading to at least one felony arrest and conviction").

Here, the magistrate judge comprehensively reviewed the totality of the circumstances and concluded that a *Franks* hearing was not warranted. We therefore affirm the district court's denial of Mr. Hancock's request for a *Franks* hearing.

**B.**

Mr. Hancock renews his claim that his Colorado convictions cannot be considered predicate offenses for purposes of § 922(g)(1) because he received an "unconditional" discharge for those convictions.[19] Section 922(g) of Title 18 of the United States Code provides that "[i]t shall be unlawful for any person—(1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year[,] … to … possess in or affecting commerce, any firearm or ammunition … ." Excluded from the definition of "crime punishable by imprisonment for a term exceeding one year," however, is "[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored … unless such pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." 18 U.S.C. § 921(a)(20).

We have described this second provision as "an anti-mousetrapping rule, designed to ensure that persons who have been told that all civil rights have been restored are not taken by surprise when the statute books contain reservations (such as a ban on possessing firearms) omitted from the communication." *United States v. Burnett*, 641 F.3d 894, 895 (7th Cir. 2011).

---

[19] Appellant's Br. 10.

Consequently, if a state advises a convicted felon that his "'big three' civil rights" have been restored—"the rights to vote, to hold office, and to serve on juries"—then it also must provide "express" notice that he may not possess firearms. *Buchmeier v. United States*, 581 F.3d 561, 564, 565 (7th Cir. 2009) (en banc). It is not sufficient notice that "the state's statutes at large" contains such a prohibition. *Id.* at 565. Rather, "[t]he statute asks only what a document contains. If the document says that civil rights have been restored but omits a firearms qualification, then the conviction no longer counts as a violent felony … . Section 921(a)(20) directs us to the four corners of the document, and there we stop." *Burnett*, 641 F.3d at 896.

Here the discharge document issued by the Colorado Department of Corrections is silent as to the restoration of *any* rights. The "Statutory Discharge" states: "The above named inmate is to be unconditionally discharged from the custody of the Department of Corrections pursuant to 18-1.3-401."[20] Because the document does not mention the restoration of rights, and because our analysis begins and ends with the four corners of the document, Mr. Hancock's Colorado felonies are not excluded from consideration by § 921(a)(20).

Mr. Hancock maintains, however, that our analysis should not end there. He notes that the discharge document references section 18-1.3-401 of the Colorado Revised Statutes, which states in relevant part:

> (3) Every person convicted of a felony, whether defined as such within or outside this code, shall be disqualified from holding any office of

---

[20] R.62-1.

> honor, trust, or profit under the laws of this state or from practicing as an attorney in any of the courts of this state during the actual time of confinement or commitment to imprisonment or release from actual confinement on conditions of probation. Upon his or her discharge after completion of service of his or her sentence or after service under probation, the right to hold any office of honor, trust, or profit shall be restored, except as provided in section 4 of article XII of the state constitution.

Colo. Rev. Stat. Ann. § 18-1.3-401 (West 2016). Mr. Hancock further contends that, because his prior convictions are not listed in Article XII, Section 4 of the Colorado Constitution,[21] his right to hold office has been restored. Moreover, he continues, a different article of the Colorado Constitution automatically restores his right to vote after completion of his sentence.[22] Finally, the Colorado Constitution specifically guarantees the right to bear arms to all persons: "The right of no person to keep and bear arms in defense of his home, person

---

[21] *See* Colo. Const. art. XII, § 4 ("No person hereafter convicted of embezzlement of public moneys, bribery, perjury, solicitation of bribery, or subornation of perjury, shall be eligible to the general assembly, or capable of holding any office of trust or profit in this state.").

[22] *See* Colo. Const. art. VII, § 10 ("No person while confined in any public prison shall be entitled to vote; but every such person who was a qualified elector prior to such imprisonment, and who is released therefrom by virtue of a pardon, or by virtue of having served out his full term of imprisonment, shall without further action, be invested with all the rights of citizenship, except as otherwise provided in this constitution.").

and property, or in aid of the civil power when thereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons." Colo. Const. art. II, § 13. Mr. Hancock therefore submits that, because the discharge references the statute, which in turn references the Colorado Constitution, he was sent on an "Easter egg hunt" for his rights,[23] which eventually misled him to conclude that an unconditional right to possess firearms had been restored to him.

We cannot accept this argument. The requirement that a state provide "express" notice of a continuing firearm prohibition only applies "[w]hen the state gives the person a formal notice of the restoration of civil rights." *United States v. Glaser*, 14 F.3d 1213, 1218 (7th Cir. 1994). As we already have observed, the notice Mr. Hancock received does not speak to the restoration of rights. The notice, therefore, stands in contrast to the notice sent in *Buchmeier* that specifically informed the recipient of "restoration of your right to vote and to hold offices created under the constitution of the state of Illinois." 581 F.3d at 564.

The rule of *Buchmeier* is confined to situations in which the state provides a notice of the restoration of civil rights to a former inmate. Absent such a notice, the proviso to 18 U.S.C. § 921(a)(20) requiring that the "restoration … expressly provide[] that the person may not … possess … firearms" simply does not apply. The district court, therefore, did not err in considering his Colorado convictions as predicate offenses for purposes of § 922(g)(1).

---

[23] Appellant's Br. 13.

## Conclusion

For the reasons set forth in this opinion, the judgment of the district court is affirmed.

AFFIRMED