In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2184

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CHRISTOPHER DARON HICKS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 07 CR 56—**J.P. Stadtmueller**, *Judge.*

ARGUED NOVEMBER 30, 2010—DECIDED MAY 27, 2011

Before KANNE, WILLIAMS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* This successive appeal picks up where we left off in *United States v. Hicks*, 539 F.3d 566, 571-72 & n.1 (7th Cir. 2008) (*Hicks I*). Did Milwaukee Police Detective Donald Brown base his threat to obtain a search warrant on "a legitimate belief" that police could obtain a warrant, or was it a pretextual threat potentially rendering the subsequent consent involuntary? In *Hicks I*, we instructed the district court to determine the factual

basis supporting Detective Brown's statement to Samella Smith—who initially resisted consenting to her home's search—that if she did not consent police would simply obtain a warrant. *Id.* at 572. Once the court answered that question, it was to reassess the totality of the circumstances to determine the voluntariness of Smith's consent. *Id.* at 572 n.1.

*Hicks I* focused on appellant Christopher Hicks's arrest and the subsequent search of Smith's residence in which police found the weapons that formed the basis of Hicks's federal criminal charges. *Id.* at 567-68. Hicks entered a plea agreement that reserved the right to appeal the denial of his motion to suppress the weapons. *Id.* at 567. Because this appeal turns on whether the police had a reasonable factual basis to support probable cause for a warrant to search Smith's residence, we will examine what the police knew when Detective Brown told Smith that police could get a warrant. Specifically, we will focus on what Milwaukee Police Detective Wayne Armon knew because it was his statement to Detective Brown that he had "enough" evidence for a warrant that supported Brown's "legitimate belief." As we noted in *Hicks I*, we do not question that Detective Brown genuinely believed that absent Smith's consent the police could get a warrant. *Id.* at 571. Yet because Detective Brown based his belief on Detective Armon's statement that he could get a warrant, we must examine the factual basis for Armon's belief that the police could get a warrant. If Detective Armon had a reasonable factual basis to support his belief that police had enough for a warrant, then Detective Brown's state-

ment to Smith about the potential of a search warrant was an accurate assessment of Smith's options and not a pretextual assertion. On the other hand, if Armon lacked a factual basis then his statement to Brown about the availability of a warrant would render Brown's statement a pretextual threat that could render Smith's consent involuntary. As we explained in *Hicks I*, this analysis prevents police from skirting the voluntariness requirement of consent searches by compartmentalizing information. *Id.* at 572. If all the officer on the scene needed to support a claim that police could get a warrant were assurances from the lead investigating officer that he had "enough" for a warrant, the investigating officer's factual basis for probable cause would not matter as long as the arresting officer genuinely believed the investigating officer. We thwart this latent "cat's-paw-like circumvention of the rule" by determining "whether there was a reasonable factual basis on which to conclude there was probable cause." *Id.*

At a December 18, 2008, evidentiary hearing on remand, Detective Armon testified about what he knew, how he knew it, and when he knew it. On April 24, 2009, the district court adopted a magistrate judge's recommendation that the threat to get a warrant was not pretextual and that Smith's consent was otherwise voluntary. *United States v. Hicks*, No. 07-CR-56, 2009 WL 1110397 (E.D. Wis. Apr. 24, 2009). Hicks is still not convinced that Smith's consent was voluntary and in this second appeal continues to assert that the results of the search should be suppressed. We will outline the district court's findings as to Detective Armon's factual

basis and then review the trial court's finding that Armon had a reasonable factual basis to support his belief that he could get a warrant. (The government does not contend that Hicks lacks standing to challenge this search. As noted in *Hicks I*, he lived with Smith and four children at the searched residence. *Id.* at 567-68.)

## I. Factual Background

On appeal, Hicks does not raise any challenges to the district court's factual findings; his contention is that the district court erred in its bottom-line conclusion that Detective Armon's belief that he had probable cause was reasonable. Thus, we rely on the facts as found by the district court, which, unless noted otherwise, were derived from Detective Armon's testimony at the December 18, 2008, evidentiary hearing. *See United States v. Taylor*, 596 F.3d 373, 375 (7th Cir.) (relying on the district court's findings of fact because the defendant did not challenge them on appeal), *cert. denied*, 130 S. Ct. 3485 (2010). The events triggering Detective Armon's investigation began after a Milwaukee jury on October 11, 2006, found Gary Anderson guilty of murdering Sidney Smith.[1] Detective Armon testified that he learned that during the trial Anderson supporters exchanged words, looks, and threats with Smith supporters. After the verdict about fifteen to twenty of Smith's family members and friends left

---

[1] The record does not indicate whether Sidney Smith was of any relation to Hicks's girlfriend Samella Smith.

the courthouse and congregated on the porch of the Randall family's Milwaukee home. A few houses away, supporters of Anderson gathered and moved in the direction of the Randall home. Verbal exchanges escalated into a neighborhood brawl. A few minutes later, an unseen assailant (or assailants) shot at the Smith supporters multiple times, striking Kimberly Dudley (a Smith supporter) three or four times resulting in her hospitalization. Detective Armon testified that the high number of 9-millimeter shell casings recovered at the scene and witnesses' statements that they heard shots fired in rapid succession prompted police to believe that a 9-millimeter semiautomatic handgun with an extended clip was used in the shooting. Police compiled a list of suspects that included Brandon and Kelsey Williams, Marcus Finch, Jerrell Starks, a man named Colby, Jermaine Stevens, and Christopher Hicks. Police arrested Kelsey Williams on the day of and at the scene of the shooting but Kelsey denied knowing anything about the incident.

At some point, the police arrested Finch. He told Detective Armon that after the verdict, he went with a group of people to Brandon's home, where he saw a person known as C-Dub leave after Brandon told C-Dub to "get the chopper." Detective Armon testified that he understood the term "chopper" to be a street term for a "semiautomatic weapon." Detective Armon later determined that C-Dub's real name was Christopher Hicks. Finch told Detective Armon that he, Brandon and Kelsey Williams, and Colby, left Brandon's home (about a half a block from the Randall home) and walked to the scene of the shooting, arming themselves with weapons en route.

Finch told Armon that during the above-mentioned brawl he saw Hicks and an unidentified person drive onto the block in Hicks's vehicle and park. Detective Armon testified that Brandon later confirmed to police that he told Hicks to "get the chopper" and that he had seen Hicks with a 9-millimeter handgun. But Brandon did not tell Detective Armon precisely when he saw Hicks with "the chopper."

Detective Armon also talked to Frankie Randall, whose aunt owned the home where the Dudley shooting occurred. Randall told him that he saw Kelsey and Brandon Williams, Jerrell Starks, Colby, and Marcus Finch approach the house before the shooting. Randall remembered seeing a car he believed belonged to Hicks. After the shooting, Randall told Detective Armon that he talked to people in the neighborhood who said that Hicks and a man known as Nephew (later determined by police to be Jermaine Stevens) were the shooters. Randall told police that he and a friend at one point attempted to purchase a 9-millimeter with an extended clip from Stevens. Detective Armon testified that Randall told him that Hicks, Stevens, and a third person (later determined to be in prison at the time of the shooting) were "always together in the neighborhood." Randall told Detective Armon that whenever there's "drama or something about to happen, one of the three would have that gun with the extended clip." Detective Armon testified that he believed that a 9-millimeter semiautomatic handgun with an extended clip was at the residence of either Hicks, Stevens, or Hicks's parents based on information from Randall, Finch, and three

others in the neighborhood who "saw these people on a daily, daily basis."

Detective Armon testified that he ruled out Hicks's parents' house as "the chopper's" location based on information he gathered in December from a confidential informant (CI) who knew the real names of C-Dub (Hicks) and Nephew (Stevens) and claimed to be close to them. The CI's claim that Hicks and Stevens jointly possessed "the chopper" was corroborated by Brandon Williams (who saw Hicks with the firearm at an unidentified time) and Randall (who said he tried to buy "the chopper" from Stevens). The CI directed police to Hicks's and Stevens's residences and told police that the gun they were looking for was at one of those two locations. Detective Armon testified that the CI's knowledge of Hicks's and Stevens's residences was further corroborated after police performed surveillance on the homes and visually confirmed that Hicks and Stevens lived at these respective residences.

Based on this information, Detective Armon testified that he decided to arrest Hicks and Stevens. Detective Armon decided not to get search warrants because he believed that he:

> . . . had enough information, based upon the interviews of the co-conspirators, people that we had talked to in the neighborhood, if you want to use the term "informants," and the fact, the last fact of one of the people that we had talked to had actually been in their houses and saw guns.

So I believed that we had enough to get a warrant quickly. And [Assistant District] Attorney [Jeffrey] Griepp, he said "If you have any problem or you think you need a warrant, call me."

Detective Armon testified that he did not want to get a search warrant because "of the timeframe that we were working with" and his desire to prevent the disclosure of his sources. Detective Armon testified that his aim was to "arrest Mr. Hicks and see if we can get the gun, if he had it." Detective Armon believed that both Hicks and Stevens would answer their doors when police knocked:

. . . [b]ecause I believe they didn't know they had become the target of the investigation. I had never talked to them, I had never approached them. I just didn't think that they thought that we would be interested in them.

*  *  *

That was my belief. Knock on the door, identify yourself as police, can I come in and talk to you, I believed they would say yeah.

Detective Armon orchestrated the December 24, 2006, arrests. He walked up to Stevens's door and performed surveillance on Hicks's residence to get "the necessary information so that we could provide it to Mr. Griepp for the description of the place to be searched if need be." On Christmas Eve, Detective Armon directed a tactical squad to Stevens's residence and Detective Brown directed a squad to Hicks's residence. Detective Armon

told Detective Brown that they were looking for guns—and in particular "the chopper." Armon told Brown to let him know if Hicks did not open the door and he would contact Assistant District Attorney "Griepp and we'd apply for a search warrant."

We know the rest of the story from *Hicks I*. Police knocked and Hicks answered the door. 539 F.3d at 568. Police immediately handcuffed and arrested him on two outstanding municipal warrants and for his alleged participation in the Dudley shooting. *Id.* at 567-68. Police found Hicks's girlfriend Samella Smith and her children during a protective sweep of the home. Police detained Smith and her children in the living/dining room. *Id.* at 568. After police removed Hicks from the residence, Detective Brown asked Smith for consent to search her home. *Id.* Smith told Detective Brown to get a warrant. *Id.* Detective Brown told Smith the police could get a warrant, but that they thought firearms were in the home, implying that her children were in danger. *Id.* Detective Brown also told Smith that it was Christmas Eve and that if she cooperated the police would not destroy her home during the inevitable search. *Id.* After a few minutes of conversation, Smith told Detective Brown "go ahead." *Id.* But Smith refused to sign Detective Brown's memo book indicating her consent to the search. *Id.* Detective Brown testified that he did not know the full extent of Detective Armon's investigation, but that he knew Armon concluded that he had enough evidence for a warrant if Smith refused to consent to the search. *Id.* at 567. (As noted in *Hicks I*, Armon had in-

structed Brown to get consent to search and that there was enough to get a search warrant, if necessary. *Id.*)

In the home's bedroom, police found a loaded Smith and Wesson .40-caliber semiautomatic handgun and a loaded sawed-off Mossberg 12-gauge shotgun with a pistol grip. These weapons became the basis of the government's prosecution against Hicks.

By the way, during the essentially simultaneous encounter at the Stevens residence, Stevens did not open the door when police knocked. But before police arrested him, members of Detective Armon's squad (which had secured the home's perimeter) saw Stevens toss what turned out to be a black 9-millimeter semiautomatic handgun with an extended clip, apparently "the chopper," from a window. There is no indication in the record that "the chopper" was recovered before Detective Brown told Samella Smith that a warrant could be obtained.

## II. Analysis

Hicks argues that Detective Brown's claim to Smith that police could get a warrant if she did not consent to a search was unfounded and served as an improper pretext to gain her consent to the warrantless search of her residence. Our review is confined to the narrow question of whether Detective Armon had a reasonable factual basis to support his belief that police could get a warrant to search Smith's residence. Detective Brown's statement to Smith that police could get a warrant was based on Detective Armon's stated belief that the police

had "enough" for a warrant. Whether Detective Armon's statement to Detective Brown about the availability of a warrant was genuine or pretextual rests on whether Detective Armon had a reasonable factual basis to support probable cause. If Detective Armon lacked a reasonable factual basis for probable cause, then Detective Brown's expressed intention to obtain a warrant "was necessarily a baseless/pretextual threat that may render Smith's consent involuntary." *Hicks I*, 539 F.3d at 572.

Warrantless searches such as the one performed at Smith's residence are permissible if police receive voluntary consent. *United States v. White*, 979 F.2d 539, 542 (7th Cir. 1992) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)). Whether a person consents "voluntarily depends on 'the totality of all the circumstances.'" *Id.* (quoting *Schneckloth*, 412 U.S. at 227). "The government bears the burden of showing voluntariness by a preponderance of the evidence." *Id.* (citing *Schneckloth*, 412 U.S. at 222). We will not reverse the district court's finding that Smith consented voluntarily unless that finding is clearly erroneous. *Id.* (citations omitted).

A baseless threat "to obtain a search warrant may render consent to search involuntary." *Hicks I*, 539 F.3d at 571 (quoting *White*, 979 F.2d at 542). Yet when the officer's "expressed intention to obtain a warrant is genuine, . . . and not merely a pretext to induce submission, it does not vitiate consent to search." *Id.* (quoting *White*, 979 F.2d at 542); *United States v. Talkington*, 843 F.2d 1041, 1047-49 (7th

Cir. 1988) (finding consent invalid partly because police falsely claimed that they were in the process of applying for a search warrant). To determine whether the warrant statement was baseless or not, we should determine whether the police had probable cause, *United States v. Evans*, 27 F.3d 1219, 1231 (7th Cir. 1994) (holding that because the police "could have obtained a search warrant" their expression of an intent to do so did not vitiate the consent); *United States v. Duran*, 957 F.2d 499, 502 (7th Cir. 1992) (holding that an admission that her husband dealt marijuana provided police with probable cause for a search warrant for the residence), or simply "a reasonable factual basis to believe there was probable cause" to the extent that the statement about the availability of a warrant was not a baseless or pretextual threat, *Hicks I*, 539 F.3d at 571; *see also United States v. Jones*, 614 F.3d 423, 426-27 (7th Cir. 2010) (holding that the "facts were sufficient for the officers to possess a reasonable factual basis to believe that there was sufficient probable cause to obtain a warrant"); *White*, 979 F.2d at 542 & n.1 (finding no evidence that the police tried to coerce consent with an empty threat and that the police obtained a search warrant for another search of the residence the following day).

To inform our discussion of whether Detective Armon had a reasonable factual basis to support probable cause, we should briefly discuss the legal standards governing probable cause findings. Probable cause exists when "known facts and circumstances" allow a reasonable belief that a search will turn up evidence of criminal activity. *United States v. Brack*, 188 F.3d 748, 755 (7th Cir.

1999) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)). Probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 243 n. 13 (1983)). As the term implies, probable cause addresses probabilities. *Brinegar v. United States*, 338 U.S. 160, 175 (1949). Mere suspicion does not suffice to establish probable cause. *Id.* An issuing magistrate's task "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Magistrates are entitled "to draw reasonable inferences concerning where the evidence referred to in the affidavit is likely to be kept, taking into account the nature of the evidence and the offense." *United States v. Singleton*, 125 F.3d 1097, 1102 (7th Cir. 1997) (citation omitted). The magistrate considers all the factors supporting the reliability of the information, including its age and the nature of the officer's experience. *See United States v. Elst*, 579 F.3d 740, 746 (7th Cir. 2009); *United States v. Lamon*, 930 F.2d 1183, 1188-89 (7th Cir. 1991); *United States v. Batchelder*, 824 F.2d 563, 564 (7th Cir. 1987). When an informant's tip supports a probable cause affidavit, we consider multiple factors in determining whether the totality of the circumstances support probable cause, including "(1) the extent to which the police have corroborated the informant's statements; (2) the degree to which the informant has acquired knowl-

edge of the events through firsthand observation; (3) the amount of detail provided; and (4) the interval between the date of the events and police officer's application for the search warrant." *United States v. Koerth*, 312 F.3d 862, 866 (7th Cir. 2002) (citations omitted). "[N]o single piece of information need satisfy every relevant consideration before we may consider it." *United States v. Wiley*, 475 F.3d 908, 915 (7th Cir. 2007). Probable cause determinations are not technical; rather, "they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar*, 338 U.S. at 175. Thus, because reviewing courts will not invalidate warrants "by hypertechnical rather than commonsense interpretation" of detailed affidavits found sufficient for probable cause, *United States v. Buonomo*, 441 F.2d 922, 929 (7th Cir. 1971) (citation omitted), we will not impose hypertechnical requirements on the reasonableness of Detective Armon's rather detailed factual basis for probable cause.

Yet it bears emphasizing that we do not analyze this case as a hypothetical judicial officer issuing a warrant because the ultimate question is the genuineness of the stated intent to get a warrant as determined by the factual basis's reasonableness. *Hicks I*, 539 F.3d at 572 ("The way to thwart this potential cat's-paw-like circumvention of the rule is to determine whether there was a reasonable factual basis on which to conclude there was probable cause.").

As an aside, our analysis of whether Detective Armon had a reasonable factual basis for probable cause parallels

the exclusionary rule's good-faith exception. Although a warrant was never issued or sought in this case, our analysis reflects aspects of the *Leon* good-faith exception: even if probable cause is lacking, evidence seized under a defective warrant may nonetheless be admissible if the police acted in good faith. *See United States v. Pappas*, 592 F.3d 799, 801-04 (7th Cir.) (citing *United States v. Leon*, 468 U.S. 897, 922-23 (1984)), *cert. denied*, 131 S. Ct. 594 (2010). Pursuant to *Leon*'s articulation of the good-faith exception, we still must examine the veracity and sufficiency of Detective Armon's factual basis establishing probable cause. 468 U.S. at 914-15. If Detective Armon relied on a factual basis "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," Armon would not receive the benefit of the good-faith exception because if he incorporated a deficient factual basis into a probable cause affidavit, *Leon* would not allow him to presume the warrant's validity. *Id.* at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975) (Powell, J., concurring in part)).

Hicks first attacks the district court's finding that Detective Armon had a reasonable factual basis for probable cause by arguing that Armon's information was hopelessly stale. Hicks argues that because the evidence of the chopper's location was based upon a CI's tip, the absence of a "temporal guidepost" counsels "against a finding of probable cause." *United States v. Harris*, 464 F.3d 733, 739 (7th Cir. 2006). In *Harris*, all an affidavit said was "that at some unspecified time the CI allegedly visited the home and observed crack for sale, and at some unspecified time thereafter the CI reported this information to" police.

*Id.*; *see also United States v. Hython*, 443 F.3d 480, 486 (6th Cir. 2006) (holding that the lack of a "temporal reference point" explaining when a "single controlled buy took place" was alone sufficient to render a warrant invalid). We agree that the lack of temporal guideposts as to when the police's sources saw Hicks with "the chopper" is troubling. Yet we also noted in *Harris* that "[p]assage of time is less critical when the affidavit refers to facts that indicate ongoing criminal activity." 464 F.3d at 739 (quoting *United States v. Spry*, 190 F.3d 829, 836 (7th Cir. 1999)). Detective Armon's sources indicated that Hicks and Stevens were known to share "the chopper" on an ongoing basis. Armon knew according to Randall that when there's "drama or something about to happen," Hicks or Stevens "would have that gun with the extended clip." This is not direct evidence of criminal activity but it does indicate *ongoing* activity and therefore assuages our concern for the absence of temporal guide-posts. The nature of the information from Detective Armon's sources suggests that Armon or the sources may not have believed that matters of timing were relevant. Detective Armon testified that the CI told him that "the gun was either at Hicks's house or Stevens's house" not sometime in the past but at the time the CI talked to Armon. Armon also testified that the CI told him that:

> Yes, they did tell me that they had seen him with the gun. What they said was if he did not have it, Mr. Stevens would have it. The gun was passing between the two of them I believe.

Detective Armon testified that the information from Brandon Williams suggested to him that Hicks and Stevens actively and continuously made use of "the chopper" at that present time:

> If you're asking me when he saw it, that was information that he was giving me because they knew each other. They all had guns and that was one of the guns that they shared was a 9-millimeter with an extended clip.

This information caused Detective Armon to believe that arresting Hicks and Stevens at their residences at the same time could lead to the discovery of "the chopper." For Detective Armon to have a sufficient factual basis to support probable cause he did not have to know for sure that the weapon was at either residence; Armon's evidence had to create a "substantial chance" or "only a probability" that he would find the weapon. *Brack*, 188 F.3d at 755. Detective Armon's information that Hicks and Stevens kept this weapon with them on a regular basis makes up for the absence of temporal guideposts. *See Wiley*, 475 F.3d at 915 ("Credibility of informants, nexus to the searched premises and to illegal activity, and the age of the information are all relevant considerations in this inquiry, but no single piece of information need satisfy every relevant consideration before we may consider it."). The district court also noted that the information from Detective Armon's CI was corroborated by Brandon Williams's statements about Hicks's prior possession of "the chopper," Randall's information that he attempted to purchase "the chopper" from Stevens, the

CI's knowledge of Hicks's and Stevens's street and real names, and the CI's ability to direct police to their respective residences. And although the district court did not explicitly rely on Detective Armon's police experience, at the time of the evidentiary hearing, Armon was in his 25th year with the Milwaukee Police Department and had been a detective since the early 1990s. Experienced officers may "draw reasonable inferences from the facts based on their training and experience." *Elst*, 579 F.3d at 746; *see also Lamon*, 930 F.2d at 1188-89; *Batchelder*, 824 F.2d at 564. A magistrate reviewing Detective Armon's factual basis for probable cause would have been entitled to rely on Armon's experience and any reasonable inferences drawn from that experience.

Hicks next argues that nothing inherent about guns supports an inference of continuing possession because guns are by their nature easily transferrable. *See United States v. Martin*, 399 F.3d 879, 881 (7th Cir. 2005) (noting that the "[p]assage of time could affect reasonableness" for Fourth Amendment purposes, "especially for search warrants that authorize the police to hunt for items that are portable (or consumable)"). Hicks charges that presuming that the suspect's alleged gun possession continued for months would amount to armchair empiricism, citing *United States v. Chambers*, 473 F.3d 724, 726 (7th Cir. 2007) ("But it is an embarrassment to the law when judges base decisions of consequence on conjectures . . . ."), *rev'd*, 555 U.S. 122 (2009).

The conclusion that Hicks (or Stevens) kept the weapon is not mere conjecture or armchair empiricism.

Multiple sources supported Detective Armon's basis for believing either Hicks or Stevens kept the weapon as a sort of modus operandi. Although handguns are quite mobile, markets exist for their sale, and they could be disposed of, Detective Armon had a sufficient factual basis for believing that Hicks and Stevens were associated with this particular weapon, perhaps even infamously. And we have recognized that, depending on the circumstances, evidence of the sighting of a gun (or related items) does not automatically grow stale as time passes. *See United States v. Harju*, 466 F.3d 602, 608 (7th Cir. 2006) (holding that even though three weeks passed between the gun's sighting by a CI and the warrant's execution, reliance on the CI was not undermined because unlike a small amount of drugs or cash, "the gun was not likely to have been sold (or consumed) during that period"); *United States v. Collins*, 61 F.3d 1379, 1384 (7th Cir. 1995) (holding that six-week-old information updated information from the previous year that the defendant possessed a firearm making it "not unreasonable for the magistrate to conclude there was a fair probability that firearms would be found"); *United States v. Singer*, 943 F.2d 758, 763 & n.7 (7th Cir. 1991) (holding that an anonymous report alleging that the defendant possessed handguns about six months before the police investigated was not stale for purposes of establishing special circumstances to justify a no-knock entry because "firearms, unlike drugs, are durable goods useful to their owners for long periods of time"); *Batchelder*, 824 F.2d at 564-65 (holding that probable cause existed partially based on nine-month-old infor-

mation that the defendant purchased illegal silencer parts for a pistol). Other courts have concluded similarly. *United States v. Maxim*, 55 F.3d 394, 397-98 (8th Cir. 1995) (holding that three-year-old information, combined with four-month-old information that the defendant continued to possess weapons as an ongoing offense, provided sufficient probable cause when an agent testified that based on his professional experience survivalists kept their weapons for a long time and the suspected criminal activity was the continuing offense of possession); *United States v. Laury*, 985 F.2d 1293, 1314 (5th Cir. 1993) (holding that an affidavit from an agent, that based on his training and experience individuals who robbed banks tended to keep the instruments of their robberies in their possession "for long periods of time, up to and including . . . several years," prevented two-month-old information from becoming stale); *United States v. Steeves*, 525 F.2d 33, 38 (8th Cir. 1975) (holding that the passage of about three months did not invalidate a warrant seeking a pistol used in a bank robbery).

Hicks argues that other factors supported the finding in *Singer* that the defendant would likely possess a gun and the question was not whether probable cause existed but whether special circumstances justified a no-knock entry. Hicks also notes that the defendant in *Maxim* was a survivalist. But here we also have other factors supporting Detective Armon's belief that either Hicks or Stevens maintained possession of "the chopper." These additional factors support a reasonable basis supporting probable cause, not merely special circumstances

justifying a no-knock entry. Some of Detective Armon's information was dated by a few months but in the month of the search, he received information from the CI that "the chopper" would be at either the residence of Hicks or Stevens. Although we do not know when Detective Armon's sources saw Hicks and Stevens with the gun, and Hicks may not fit the profile of a survivalist, Armon's sources said that they knew Hicks and Stevens generally carried and kept "the chopper" not at particular times but on an ongoing basis. Brandon Williams and Finch tied Hicks to "the chopper" on the day of the shooting. Williams told police that at an unknown date he saw Hicks with a 9-millimeter handgun. Finch saw Hicks in a car near the shooting scene (and Randall saw what he believed was Hicks's car) where police found more than an average clip's worth of spent 9-millimeter shell casings that witnesses said were fired in a manner suggesting a semiautomatic or automatic weapon. Randall told police that he heard that Hicks and Stevens were the shooters. "The chopper" was not generically or inconsistently described. The 9-millimeter semiautomatic handgun with an extended clip was a particular weapon known in the neighborhood. The weapon's extended clip would give "the chopper" a distinctive appearance and functionality fitting Detective Armon's theory that the high number of 9-millimeter shell casings combined with witnesses hearing shots fired in rapid succession meant that the assailant used a firearm that allowed him to rapidly squeeze off a high number of shots.

Hicks asks us to consider the holding in *United States v. Charest*, 602 F.2d 1015, 1017 (1st Cir. 1979) that

common sense says "that it is unlikely that a murderer would hide in his own home a gun used to shoot someone." Yet *Charest* recognized "that time is relative and must be measured by the circumstances of each case." *Id.* at 1018 (citing *Sgro v. United States*, 287 U.S. 206, 210-11 (1932)). The circumstances in this case suggest that Detective Armon had a reasonable factual basis to believe that Hicks and Stevens kept "the chopper" with them even after the police suspected its use in the Dudley shooting. Armon testified that Brandon Williams said that Hicks and Stevens shared "the chopper." Armon testified that Randall said that when there's "drama or something about to happen," Hicks or Stevens (and a third person determined to be in prison) "would have that gun with the extended clip." Detective Armon testified that the CI told him that the weapon was "probably at Nephew's house or C-Dub's house, one of the two." And Detective Armon believed that neither Hicks nor Stevens suspected that police considered them targets. Thus, the common sense in *Charest* does not readily apply to Armon's factual basis because if neither suspect thought they were targets they would have no particular incentive to dispose of "the chopper," and Armon gathered information from several sources indicating that Hicks maintained shared possession of the weapon.

Although the district court only mentioned it in passing, we note that the magistrate judge appropriately credited Detective Armon with taking actual steps to get a search warrant such as going to the front stoops or entryways of Hicks's and Stevens's residences to

gather "the necessary information so that we could provide it to [Assistant District Attorney] Mr. Griepp for the description of the place to be searched if need be." Detective Armon also briefed Assistant District Attorney Griepp, who told Armon, "if you have any problem or you think you need a warrant, call me." Detective Armon had Assistant District Attorney Griepp's cell phone number on hand so he could call him at his home. Detective Armon testified that he did not pursue a warrant "[b]ecause of the timeframe that we were working with" and his desire to prevent the disclosure of confidential sources. These explanations provide sufficient reason for Detective Armon to try to perform the search without a warrant. That Detective Armon took steps to get a warrant, briefed the district attorney, and had sufficient reason to try to perform the search without a warrant are factors that bolster the district court's finding that Armon's instructions to Detective Brown to contact him if he needed a warrant were in fact genuine and not a pretextual ruse potentially vitiating Smith's consent. *See White*, 979 F.2d at 542 (holding that if "the expressed intention to obtain a warrant is genuine, however, and not merely a pretext to induce submission, it does not vitiate consent").

We hold that the district court did not clearly err in finding that Detective Armon had a reasonable factual basis to conclude that he had probable cause for a search warrant. We do not address whether in fact there was probable cause but we are satisfied that Detective Armon had a *reasonable* factual basis for probable cause and took actions consistent with the mindset of

someone who believed he could, if necessary, get a search warrant. Thus, consistent with *Hicks I*, 539 F.3d at 571, we also hold that the district court did not clearly err in finding that Smith "freely" consented to the search of her home.

## III. Conclusion

We AFFIRM the judgment of the district court.