In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 24-1776 & 24-2260

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CORNELIUS M. JACKSON,

*Defendant-Appellant.*

_____

Appeals from the United States District Court for the
Eastern District of Wisconsin.
No. 2-20-cr-00229 — **Brett H. Ludwig**, *Judge.*

_____

ARGUED JANUARY 29, 2026 — DECIDED JUNE 22, 2026

_____

Before RIPPLE, LEE, and KOLAR, *Circuit Judges.*

RIPPLE, *Circuit Judge.* A jury convicted Cornelius M. Jackson of four counts of sex trafficking and one count of conspiracy to commit sex trafficking. He now contends that the initial search warrant application was not supported by probable cause, that the district court erred by denying him a *Franks* hearing because the affidavit supporting the warrant application contained material omissions, and that the district court should not have permitted the Government's expert witness

to testify at trial. For the reasons set forth in this opinion, we affirm the judgment of the district court.

**I**

**BACKGROUND**

At around 5:00 a.m. on August 23, 2020, Milwaukee Police Officer James Pittman was dispatched to East Brady Street to investigate calls from two people. The first caller, later identified in this case as AV-4, reported that her belongings had been stolen and that she had been left in an unfamiliar area by the people with whom she had been staying. The other caller reported that he had seen a man throw a woman down and thought that man might be the woman's "pimp."

Officer Pittman approached AV-4 when he arrived on the scene. But there was another woman on the street who attempted to interfere with Officer Pittman's interaction with AV-4. At first, AV-4 told him that she had called the police to report her stolen items and that no one was trying to hurt her. Apparently not accepting her account on face value, Officer Pittman pretended to arrest her in order to take her somewhere safe.

Once in a police van, AV-4 told Officer Pittman that she had never engaged in prostitution and that "everything was going fine" with Mr. Jackson and the other women with whom she had been living.[1] With additional questioning, however, AV-4 told Officer Pittman that Mr. Jackson had choked her to unconsciousness while two women yelled at her. During this interview, other officers informed Officer Pittman that pole camera footage corroborated AV-4's

---

[1] R.70 at 4.

account. AV-4 told Officer Pittman that Mr. Jackson had threatened to kill her, wanted to control her activities, and kept a firearm in his home. She also explained that Mr. Jackson had told her he wanted her to "work for what she's worth," and described to the officers the hours and pricing for sex work that he required her to perform.[2]

Because he suspected sex trafficking, Officer Pittman notified the Sensitive Crimes Division of the Milwaukee Police Department. A few hours after Officer Pittman's arrival on the scene, Officer Gerardo Orozco of that division arrived and more thoroughly interviewed AV-4. AV-4 explained that she had met Mr. Jackson on a dating application, provided a description of the car he had used to pick her up, and said that he had called for three other women to "hang out" with her at a hotel room. Then, AV-4 was required to leave the room when men came into the room with the other women. AV-4 spent the next two and a half weeks at Mr. Jackson's Waukesha residence, where Mr. Jackson told her she had to make money to pay the bills. She conducted six "dates" at the residence; each involved engaging in sex acts for money. Mr. Jackson required her to give him all her earnings. On the night of her encounter with Officer Pittman, AV-4 had traveled to downtown Milwaukee with Mr. Jackson and a few other women.

Officer Orozco's interview with AV-4 served as the basis for Waukesha Detective Kenny Stucker's application for a search warrant for Mr. Jackson's Waukesha address and the seizure of electronic devices inside. The affidavit supporting the application recites that Detective Stucker received a report

---

[2] *Id.*

from the Milwaukee Police Department of "strangulation/suffocation and human trafficking."[3] The affidavit did not report that AV-4 first told Officer Pittman that no one was trying to hurt her or that she disclosed Mr. Jackson's conduct only after Officer Pittman had pretended to arrest her. It did explain, however, that the women were required to text Mr. Jackson about everything that transpired with their "dates" and to obtain photos of the men's genitals and middle fingers. It also described Mr. Jackson's control of advertisements and escort conversations on websites for escort and prostitution services. It included Detective Stucker's personal knowledge that "individuals engaging in commercial sex trafficking typically utilize log books and client databases whether written or electronic to schedule dates and further the ends of their enterprise."[4]

A judicial officer granted a search warrant based on the application. On August 27, 2020, law enforcement officers executed the warrant at Mr. Jackson's residence and on his vehicle parked there. The officers recovered nineteen cell phones and other electronic devices and ammunition. They also retrieved identification and bank cards for individuals who did not live there. A grand jury later indicted Mr. Jackson. The indictment accused him of running a sex trafficking operation from March 2014 through August 2020 in the Eastern District of Wisconsin, the District of Minnesota, the District of North Dakota, and the Northern District of Ohio. More specifically, the grand jury indicted him on four counts of sex trafficking by force, fraud, or coercion, in violation of 18

---

[3] R.55-3 at *6, ¶ 2.

[4] *Id.* at *8, ¶ 17.

U.S.C. § 1591(a)(1) and (b)(1), and one count of conspiracy to engage in sex trafficking, in violation of 18 U.S.C. § 1594(c). After a trial, Mr. Jackson was convicted on all five counts. The district court sentenced him to 30 years' imprisonment on each count, to run concurrently, and 10 years of supervised release.

## II

## DISCUSSION

Mr. Jackson asks us to review the district court's denial of his pre-trial motion to suppress evidence obtained from his cell phone under the search warrant and the denial of his motion for a *Franks* hearing. He also maintains that the district court abused its discretion when it permitted the Government's expert witness to testify at trial.

## A

We first address Mr. Jackson's contention that the district court should have excluded all the evidence derived from the search of his cell phone. He contends that there was no nexus between his cell phone and the criminal behavior under investigation. In reviewing a denial of a motion to suppress evidence, we review legal questions de novo and factual determinations for clear error. *United States v. Dixon*, 137 F.4th 592, 601 (7th Cir. 2025).

Before the district court, Mr. Jackson contended that the search warrant did not set forth a sufficient nexus between his electronic devices and human trafficking. The district court concluded that this argument found no support in the record. Referring to the affidavit supporting the application for a search warrant, the court noted the description of Mr. Jackson having met AV-4 on a dating application, his creation of her

profile on an escort website, and his use of her pictures from her phone for the profile. The court also noted that Detective Stucker wrote that, according to his training and experience, sex traffickers often use log books and client databases and that these tools are sometimes electronic. Therefore, concluded the court, there was a fair probability that evidence of sex trafficking would appear on Mr. Jackson's phone and other electronic devices.

The Fourth Amendment requires probable cause to support a search warrant. When an affidavit is the only evidence supporting a search warrant, the warrant's validity depends on the strength of the affidavit. *United States v. Mykytiuk*, 402 F.3d 773, 775 (7th Cir. 2005) (quoting *United States v. Peck*, 317 F.3d 754, 755–56 (7th Cir. 2003)). The affidavit establishes probable cause when it "sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *Id.* at 776 (citation modified). A finding of probable cause will be upheld so long as there was a "'substantial basis for … conclud[ing]' that a search would uncover evidence of wrongdoing." *United States v. Rees*, 957 F.3d 761, 765 (7th Cir. 2020) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). This analysis is "not technical" and considers the totality of circumstances. *United States v. Hicks*, 650 F.3d 1058, 1065 (7th Cir. 2011).

Mr. Jackson argues that there was no nexus between his electronic devices and the sex trafficking because the only cell phone cited in the affidavit was AV-4's phone, not Mr. Jackson's.

While the affidavit described Mr. Jackson's use of AV-4's cell phone to set up an escort profile for her online, it also explained that AV-4 met Mr. Jackson on a digital dating

application. And it stated that AV-4 was instructed to text Mr. Jackson during every "date" to tell him if the situation was good or bad.[5] The affidavit therefore supported that Mr. Jackson was using at least one electronic device to recruit and communicate with potential victims and to help monitor the "dates."

Mr. Jackson also submits that Detective Stucker's experience "on a wide array of crimes including sexual assault of children" did not sufficiently qualify him to assess reliably whether Mr. Jackson was engaged in human trafficking or whether a search of his electronic devices would reveal evidence of those crimes.[6] But this argument invites us to impose the sort of "hypertechnical" analysis that we found inappropriate to invalidate a warrant in *Hicks*, 650 F.3d at 1066. As we said there, "[p]robable cause determinations are not technical; rather, they are the factual and practical considerations of everyday life" and, when evaluated through that lens, we think that the detective's experience was both relevant and probative to the task before the district court. *Id.* at 1065 (citation modified). Indeed, it was this very background that allowed the detective to assert that he was "aware that individuals engaging in commercial sex trafficking typically utilize log books and client databases whether written or electronic to schedule dates and further the ends of their enterprise."[7] This statement by the detective explains the relevance of AV-4's

---

[5] *Id.* at *8, ¶ 13.

[6] *Id.* at *6, ¶ 1.

[7] *Id.* at *8, ¶ 17.

description that the victims were instructed to text him during every "date."

In short, there was probable cause to issue the search warrant because "'known facts and circumstances' allow[ed] a reasonable belief that a search [would] turn up evidence of criminal activity." *Id.* at 1065 (quoting *United States v. Brack*, 188 F.3d 748, 755 (7th Cir. 1999)).

**B**

Mr. Jackson also contends that the district court erred when it denied his motion for a *Franks* hearing. We review the denial of a *Franks* hearing for clear error, but we "review de novo any legal determinations that factored into the district court's decision." *United States v. Maxwell*, 143 F.4th 844, 854 (7th Cir. 2025).

Before the district court, Mr. Jackson contended that he was entitled to a *Franks* hearing. These hearings explore the validity of a search warrant affidavit. *Franks* grants a criminal defendant the limited right to challenge the veracity of statements made in an affidavit supporting a search warrant. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). If a defendant makes a "substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Id.* The clear error standard of review also applies when, as here, the defendant challenges the affidavit on the ground that key facts were omitted. *United States v. Hancock*, 844 F.3d 702, 707–08 (7th Cir. 2016).

Mr. Jackson submits that he was entitled to the hearing because the affidavit omitted all mention of AV-4's initial denial that anything was wrong. To be granted a *Franks* hearing, however, a defendant must make a "*substantial* preliminary showing" that the affidavit contained a material omission, that the affiant made the omission intentionally or recklessly, and that the omission was necessary to support the finding of probable cause. *United States v. Maro*, 272 F.3d 817, 821 (7th Cir. 2001) (emphasis added) (quoting *Franks*, 438 U.S. at 155–56). The district court decided that the omitted facts were not material to the finding of probable cause. When Officer Pittman first questioned AV-4, she had just been choked to the point of passing out and was in the presence of another woman involved in Mr. Jackson's operation. Once Officer Pittman separated her from the other woman, she began answering questions in "substantial detail."[8] We agree with the district court that "[t]he fact that she denied involvement at first does not make her later statements untrustworthy."[9]

"[A]n omitted fact is material if its inclusion would have negated probable cause." *Hart v. Mannina*, 798 F.3d 578, 592 (7th Cir. 2015) (quoting *Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010)). To make that determination, we "examine whether a hypothetical affidavit that included the omitted material would still establish probable cause." *Id.* at 593 (quoting *United States v. Robinson*, 546 F.3d 884, 888 (7th Cir. 2008)). The affidavit would still have established probable cause if it included AV-4's initial statements to Officer Pittman. AV-4, a sex crime victim, initially denying involvement in criminal

---

[8] R.79 at 10.

[9] *Id.*

activity did not negate the probable cause created by her later statements affirming them, especially considering that one of the other women in the trafficking ring had been interjecting herself into the officer's questioning of AV-4. AV-4 had also just been choked to unconsciousness by Mr. Jackson. The affidavit shows that AV-4 provided extensive and thorough detail on her experience with Mr. Jackson and the methods that the trafficking victims used to meet men, both in Waukesha and in Milwaukee. Even if Detective Stucker had included AV-4's initial report that no one had hurt her beyond stealing her belongings, that inclusion would not have negated probable cause.

Detective Stucker omitted statements that would have had, at best, a minor exculpatory effect. Notably, he also omitted evidence that would have strengthened the affidavit, such as that Mr. Jackson's choking of AV-4 was caught on a pole camera and that a bystander saw Mr. Jackson accost her. In any event, when viewed in their totality, these omissions are not egregious and certainly manifest no reckless disregard for the truth. The affidavit, crafted to establish probable cause, understandably focuses on the high level of detail that AV-4 provided investigators, including the specific color and interior of Mr. Jackson's car; his purchases at a gas station in a particular town; the floor of their hotel room at a casino; Mr. Jackson's address; the prices for all of the acts of sexual contact that the victims were expected to perform; the rules the victims had to follow; the website on which Mr. Jackson posted an escort advertisement of AV-4; the exact number and length of "dates" AV-4 had; and the exact number of

times AV-4 went to Milwaukee to attempt to engage in commercial sex acts.[10]

Mr. Jackson contends that the district court made conclusory statements unsupported by the affidavit, such as noting that AV-4's "initial denials are thus hardly surprising" given that she had "just been choked to the point of unconsciousness …."[11] He also asserts that the district court engaged in "mere speculation" when it wrote that AV-4 "opened up" to police as a result of Officer Pittman separating her from the other woman.[12] These objections are without merit. The district court hardly engaged in impermissible speculation; rather, it properly assessed the materiality of each omission by considering whether, had the omission been included, there would still have been probable cause. *Id.* at 593.

Mr. Jackson also argues that the affidavit contained no corroboration of AV-4's inculpatory statements. He invites our attention to *United States v. Glover*, 755 F.3d 811 (7th Cir. 2014). There, we determined that a defendant was entitled to a *Franks* hearing after a magistrate judge granted a search warrant supported by an affidavit based solely on the statement of a police informant. We deemed the affidavit insufficient because it contained no information about the informant's credibility. *Id.* at 816.

We have a very different situation here. The *Glover* informant had a prior criminal record (including while acting as an informant), and he engaged in gang activity, thus raising the

---

[10] R.55-3 at *6–9.

[11] R.79 at 10.

[12] Appellant's Br. 32; R.79 at 10.

possibility that gang rivalries motivated his information. Previously, he also had used aliases to deceive the police and expected payment for his information. *Id.* at 817. The informant's statements also "provided little detail." *Id.* By contrast, AV-4 was a victim of the criminal activity under investigation. Her statements were based on her first-hand knowledge as one of the victims of the trafficking ring, not as an outside, rival gang member. There is no suggestion that she expected payment for her statements. While police "confirmed only minor facts and legal conduct" in *Glover*, *id.*, here, police confirmed from pole camera footage that AV-4 had been choked to unconsciousness by Mr. Jackson. AV-4's initial denials of criminal wrongdoing were not material to the probable cause determination.

Ultimately, Mr. Jackson cannot make a substantial preliminary showing of a material omission that would alter the probable cause determination or of a deliberate or reckless disregard for the truth.

### C

We come to Mr. Jackson's contention that the district court erred by allowing the Government's expert to testify. The admission of expert testimony is governed by *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702. Rule 702 requires that expert testimony assist the trier of fact and demonstrate sufficient reliability. *United States v. Johnson*, 916 F.3d 579, 586 (7th Cir. 2019). "We employ a two-step standard of review in cases challenging a district court's admission or exclusion of the testimony of an expert." *C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015). First, we review de novo the district court's application of the *Daubert* framework. Then, if the district court properly applied

*Daubert*, we review for abuse of discretion its decision not to exclude expert testimony. *Johnson*, 916 F.3d at 586.

The approach mandated by *Daubert* applies to testimony based not only on "scientific" knowledge, but also on "technical" and "other specialized" knowledge. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). We have applied the methodology to the social sciences. *See Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) ("We have noted a number of times since the Supreme Court decided *Daubert* that its framework for assessing expert testimony is applicable to social science experts, just as it applies to experts in the hard sciences." (collecting cases)).

No matter the context, a court must always "act as a vigorous gatekeeper to ensure the reliability of expert testimony …." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 601 (7th Cir. 2021) (quoting *Robinson v. Davol Inc.*, 913 F.3d 690, 696 (7th Cir. 2019)). "In all cases," the trial court "must ensure that it is dealing with an expert, not just a hired gun." *Tyus*, 102 F.3d at 263.

**1**

While this case was in the district court, the Government filed a notice of its intent to introduce the expert testimony of Christa Jane Anderson at trial.[13] Anderson is a former prosecutor of human trafficking cases and at the time was a senior attorney adviser at a nonprofit organization focused on prosecution practices related to gender-based violence and human trafficking.

---

[13] *See* R.84.

The Government sought to have Anderson testify on thirteen different topics related to domestic sex trafficking, including the "sex-trafficking and prostitution business," "[c]ommon, unique, and/or term-of-art terminology used in the prostitution and sex trafficking industry," "[t]he grooming and recruitment process," "[t]he 'climate of fear' sex traffickers create to exploit their victims' vulnerabilities, susceptibilities, fears, or limitations," and "[t]he reasons why sex trafficking victims may not leave their traffickers at the first opportunity."[14] However, Anderson would not testify about the credibility of any victims or witnesses. She had not met the victims, reviewed any of their statements, or reviewed any evidence from the investigation in the case. Mr. Jackson sought the exclusion of Anderson's testimony. He characterized the proffered testimony as ipse dixit, not based on reliable principles and methods.[15]

At the final pretrial hearing, the district court greeted the Government's proffer with a skepticism quite evident even on the cold transcript. It raised multiple concerns about the proposed testimony. The court began its analysis by summarizing the four requirements for an expert witness to testify under Rule 702. Because the Government explained that it provided Anderson no details on the facts of the case, the district court did not consider relevant the requirement that experts reliably apply the principles and methods to the facts of each case. But the court emphasized that the "question that is presented here is not whether he engaged in criminal conduct that might be called sex trafficking under state law or might

---

[14] *Id.* at 4–6.

[15] *See* R.88.

broadly be considered sex trafficking by activists or advocates."[16] The court expressed the concern, however, that although the elements of the sex trafficking crimes at issue are set by federal law, the jury might believe that the Government proved its case if it provided evidence of what Anderson described as having seen in the past, instead of evidence that establishes the federal trafficking statute's requirements. The court also expressed concern that the Government "may be trying to have a lawyer in the guise of an expert witness … to reiterate its opening statement or to give a preliminary closing statement during the evidence of the case, and that's inappropriate."[17] And "this is a social science type expert, who is a lawyer by training, not a social scientist."[18]

The court continued to express the same cautious skepticism throughout the case. The court ruled that Anderson could "testify based on her experience, subject to cross-examination, of course, with respect to issues that are presented in this case."[19] To avoid the potential for unfair prejudice, Anderson could testify only "subject to a factual predicate being laid" that would "make clear what the relevant issues are."[20] Her "testimony would have to be narrowly tailored to address those issues and to protect Mr. Jackson from any unfair prejudice."[21]

---

[16] R.174 at 60:17–20.

[17] *Id.* at 62:05–08.

[18] *Id.* at 62:16–17.

[19] *Id.* at 72:03–05.

[20] *Id.* at 73:10–11, 72:12.

[21] *Id.* at 72:13–15.

During trial, the district court again turned to the *Daubert* issue before Anderson testified. The court asked the attorneys if they had agreed on the admissibility of some or part of the testimony, and it held a thorough discussion. Given the court's preliminary ruling, and given the Government's acquiescence to the limited scope of topics to which Anderson could testify, Mr. Jackson's counsel was willing to agree to those limited topics, subject to his challenge to the testimony's admissibility as a whole.

The Government delineated the topics about which it planned to ask Anderson. Specifically, these topics were, "the role of the, quote, 'bottom bitch,' end quote, within a sex trafficking organization"; "the reasons why sex trafficking victims may not leave their traffickers at first opportunity"; "traffickers['] use of their victims to insulate themselves from criminal liability"; and "progressive and piecemeal disclosure by victims of sex trafficking."[22] The court cautioned that, although the Government could establish Anderson's background and qualifications, it should not "gild the lily … because it could reach a point where it becomes unnecessary and unfairly prejudicial."[23] The court went on to again caution the Government to lay a foundation and be careful in light of Rule 403's balancing requirement. The court also instructed Mr. Jackson's attorney to object if the Government went too far in its questioning. Mr. Jackson's counsel did not object during the questioning.

The court recapitulated its analysis of *Daubert* and summarized that it had ordered the Government to establish the

---

[22] R.192 at 1041:16–18, 1041:21–23, 1042:01–02, 1042:07–08.

[23] *Id.* at 1043:23–24.

relevance and limited nature of Anderson's testimony. The court noted that one of Anderson's potential topics was to explain the term, "bottom bitch." The court instructed that the term could not be used in Anderson's testimony because it was "inflammatory" and had not been used in the trial so far.[24] Instead, Anderson could only use the phrase "bottom."[25]

During trial, Anderson was the Government's eleventh witness. She testified after AV-2, AV-3, and AV-4, but before AV-1. She testified to, among other things, the meaning of the term "bottom" in sex trafficking operations.[26] A "bottom" is the individual who is the second in command in the organization.[27] Anderson also explained common rules that traffickers have, including with whom victims may speak and how victims give money to the trafficker. She further explained the level of surveillance that victims in a trafficking operation experience. Anderson agreed that it was "incredibly uncommon" for "victims of sex trafficking to disclose everything that's happened to them by the trafficker immediately[.]"[28] In "[e]very single case," victims who are out in a public area do not disclose their situations to someone right away.[29] Shame, fear, the trafficker's instruction not to trust anyone, and "years and decades of history [in which] victims of trafficking

---

[24] *Id.* at 1047:03–05.

[25] *Id.* at 1047:09–12.

[26] *Id.* at 1119:13–16.

[27] *Id.*

[28] *Id.* at 1123:14–18.

[29] *Id.* at 1124:22.

have been treated like criminals" cause victims not to disclose immediately to law enforcement that they are victims.[30]

Mr. Jackson's attorney did not object to the Government's questioning of Anderson. On cross-examination, Mr. Jackson's attorney focused on differentiating voluntary sex workers and victims of sex trafficking. He also questioned Anderson about her qualifications and clarified that she did not know any details of the case at issue. The Government did not question her on redirect.

Later in the trial, the parties discussed the jury instructions. The Government objected to giving Instruction 3.13. This instruction related to Anderson, named her, and told the jury that they did not have to accept her testimony and that they should judge her opinions and testimony about sex trafficking in the same manner as that of any other witness.[31] The Government opposed the instruction because "of the type of expert opinion that was given."[32] The basis of the Government's objection is unclear in the record, but it lamented that "there's not a pattern [instruction] for a different type of expert."[33] Mr. Jackson's attorney asked that it be given, and the district court agreed.

**2**

In assessing this situation, we first must determine whether the district court properly applied *Daubert*. The

---

[30] *Id.* at 1126:22–1127:03.

[31] R.118-1 at 6.

[32] R.194 at 1572:24–25.

[33] R.195 at 1823:20–21.

district court's *Daubert* analysis was extensive and thorough. It addressed the reliability of Anderson's testimony twice, both times in depth and in light of the requirements of *Daubert* and Rule 702. "All told, such an inquiry stands in stark contrast to the cases" in which courts do not perform a *Daubert* analysis, articulate "only a one-sentence conclusion," or make "conclusory *Daubert* determinations …." *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 872–73 (7th Cir. 2021) (citation modified) (collecting cases). Accordingly, we review the district court's decision not to exclude Anderson's testimony for abuse of discretion.

**3**

Mr. Jackson submits that Anderson was insufficiently qualified to testify as an expert because (a) her training and skill as a prosecutor was for a relatively short period of time, having served eight years as a state prosecutor; (b) her methodology was unclear; (c) she was a lawyer by training, not a psychologist, despite that she testified as a social scientist; and (d) her testimony was not based on sufficient facts and data or reliable principles and methods. Also at issue is whether Anderson's testimony impermissibly bolstered the victims' testimony.

An expert witness's testimony may be based on "accumulated expertise obtained through experience and training." *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002). While courts use multiple factors to assess the reliability of expert testimony, the "district court is free to fashion an approach more precisely tailored to an evaluation of the particular evidentiary submission before it." *Id.* at 556. Here, the Government sought to have Anderson "educate the jury about some

topics in sex trafficking operations."[34] "In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." FED. R. EVID. 702 advisory committee's note to 2000 amendments.

Although Anderson served as a prosecutor for eight years, she also worked at a nonprofit organization that provides training and technical assistance to professionals working on "intimate partner violence, stalking, sexual violence, and human trafficking."[35] At the time of trial, she was the nonprofit's senior attorney advisor and had worked there for nine years. She testified that "85 percent of what I'm currently doing is based on human trafficking," and "of that, maybe 50% [sic] on sex trafficking and the other on labor trafficking."[36] Although she did not have psychology experience and was not a clinical researcher, she did attend trainings to learn about sex trafficking and provided training on sex trafficking topics. We conclude that the district court acted within its discretion in deciding that Anderon's qualifications made her a witness capable of assisting the jury in its understanding of the case. The situation presented by the facts of the case were, in all likelihood, unfamiliar to most, if not all, members of the jury. The proffered testimony, disciplined by the district court's imposed limitations and admonitions and subject to cross-examination, had the potential of assisting the jurors. The district court did not abuse its discretion in permitting Anderson to testify.

---

[34] R.192 at 1118:12–13.

[35] *Id.* at 1116:03–04.

[36] *Id.* at 1117:04–06.

Similarly, we cannot say that the district court abused its discretion in admitting Anderson's actual testimony. In other cases, we have upheld the decision of trial courts to permit expert testimony on issues relating to key terms in human trafficking and typical behaviors of victims. *See United States v. Vines*, 9 F.4th 500 (7th Cir. 2021); *United States v. Carson*, 870 F.3d 584 (7th Cir. 2017); *United States v. Dingwall*, 6 F.4th 744 (7th Cir. 2021); *see also United States v. Young*, 955 F.3d 608, 615 (7th Cir. 2020) ("The district court did not abuse its discretion by concluding that Landau's expert testimony, which defined key terms and explained common sex-trafficking dynamics, was reliable and helpful for the jury.").

*Vines* upheld the admission of testimony from an FBI special agent who testified on "the behavior of sex-trafficking victims in general" during a criminal trial of an individual accused of various counts relating to sex trafficking of a minor. 9 F.4th at 505. The agent "discussed the need to gain the trust of sex trafficking victims" during investigations "and the unwillingness of victims to reveal all details from the start, as part of ongoing victim behavior." *Id.* We determined that his testimony "merely provided insight as to sex trafficking generally and the effect on victims, which would aid a jury in understanding and evaluating the evidence presented to it." *Id.* Just like Anderson, the expert in *Vines* never spoke to the victim and never read any of the victim's statements, "and therefore his testimony could not have been interpreted as opining as to her credibility." *Id.*

In *Carson*, we described an expert who provided testimony on sex trafficking in a similar manner as here. 870 F.3d at 591. "Importantly for this case, … [the expert] explained that victims often stay with their traffickers—or leave and then

return—because they believe they have nowhere to go; that there is no one else out there for them, and no other options for them; they feel ashamed and guilty and stigmatized, thinking that they will not be accepted elsewhere." *Id.*

Our decision in *Dingwall*, although arising in a different context, provides additional basis for comparison. 6 F.4th at 753. The defendant in *Dingwall* was charged with multiple robberies. She admitted committing those robberies but sought to raise a duress defense. She asserted that she committed the robberies "in fear of brutal violence at the hands of her abusive boyfriend …." *Id.* at 746. We recognized that the Government "often introduces expert evidence to explain how traffickers systematically and intentionally coerce their victims by inflicting psychological control and fear" in human trafficking cases. *Id.* at 753 (citing *Young*, 955 F.3d at 615). We held that the district court should have afforded Dingwall the opportunity to "offer evidence of battering and its effects, including expert opinions, to support her duress defense" because "[s]uch evidence can help inform the factfinder how an objectively reasonable person in her circumstances may behave." *Id.* at 761.

Anderson's testimony was similar to that of the experts in *Vines* and *Carson*. She explained key terms in the trafficking world. Anderson also explained common rules that traffickers have, including with whom victims may speak and how victims give money to the trafficker. She further explained the level of surveillance that victims in a trafficking operation experience.

Anderson's testimony also suggested a consideration that, while important in assessing AV-4's behavior, would not have been evident to a jury with no earlier experience with human

trafficking. Mr. Jackson's attorney's opening statement claimed "[t]his was voluntary prostitution," that three of the four "alleged victims … were arrested and they cooperated with the Government," giving them "a reason to lie, to not be truthful."[37] The victims' statements "change[d] each time" they attended interviews with the Government.[38] The victims were "not coerced" because they would stay a few days or weeks with Mr. Jackson and then "left voluntarily."[39] Although the Government introduced other evidence of Mr. Jackson's use of force and coercion,[40] Anderson's testimony, although not addressing the specific facts surrounding AV-4's behavior, offered an explanation as to why a victim might still have been coerced by a trafficker even if she did not take the first available opportunity to report her experience. For example, Anderson testified that victims may avoid immediate disclosure to police because "they may be subject to punishment by the trafficker," or "other women that they were trafficked with [may] be tasked with punishing them."[41]

We also note that the district court provided a cautionary instruction to the jury to consider Anderson's testimony like any other witness. The district court showed significant sensitivity to the requirements of Rule 702 and *Daubert*, as well as to the particular strain of applying those principles in the social science area. Our precedent supports the admission of

---

[37] R.190 at 174:08–11.

[38] *Id.* at 174:15–16.

[39] *Id.* at 175:08–13.

[40] *Id.* at 188:12–22, 190:21 (footage showing a victim being choked).

[41] R.192 at 1128:16–20.

Anderson's testimony, and the district court did not abuse its discretion by admitting it.

**4**

Even if the district court had abused its discretion, allowing Anderson's testimony would be harmless error. The test for harmless error is "whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded." *United States v. Jett*, 908 F.3d 252, 267 (7th Cir. 2018) (citation modified). Even if Anderson had not testified, the jury had overwhelming evidence to convict. For example, evidence from Mr. Jackson's phone and the phone of AV-2 showed numerous communications to and from Mr. Jackson about the victims, their "dates," and money.[42] Mr. Jackson's social media accounts, online advertisements, and business records provided further evidence.[43] The four victims each testified about their experiences. And pole camera video confirmed that AV-4 was choked by Mr. Jackson on August 23, 2020.[44] Anderson, in turn, did not testify about any specifics of the case because she was never given any details about it.

**Conclusion**

The judgment of the district court is affirmed.

AFFIRMED

---

[42] R.190 at 227:22–228:14 (price sheet listing sexual acts and times from Mr. Jackson's phone).

[43] R.192 at 1159:18–21 (Mr. Jackson's advertising of AV-1 online).

[44] R.190 at 188:12–22, 190:21 (footage showing choking).